Donald J. SMITH, Administrator
of the Estate of Maureen T.
Smith, Deceased

v.

PAOLI MEMORIAL HOSPITAL, Main Line Health Radiology, David H. Forsted, M.D., F.A.C.R., Valerie T. Hunt, M.D., Donald G. Samuelson, M.D., Elise Shreck, M.D., Jefferson Health System, Main Line Gastroenterology Associates, P.C., Matthew R. Astroff, M.D., Richard D. Tolin, M.D., Surgical Specialists of the Main Line, P.C., Timothy Fox, M.D., Presbyterian Medical Center, Andrea Russo, M.D., Nicholas C. Battafarano, M.D., and N.C. Battafarano, M.D., P.C.

Appeal of: Matthew R. Astroff, M.D., Richard D. Tolin, M.D. & Main Line Gastroenterology Associates, Appellants.

Superior Court of Pennsylvania.

Argued May 10, 2005.
Filed Oct. 18, 2005.

---

Barbara S. Magen, Philadelphia, for appellants.

David C. Federman, Philadelphia, for Smith, appellee.

BEFORE: FORD ELLIOTT, JOYCE, and MONTEMURO,* JJ.

OPINION BY FORD ELLIOTT, J.:

¶ 1 The pivotal issue in this case is whether the plaintiff's expert medical witnesses qualified to testify as to the standard of care of defendant physicians pursuant to the requirements of the MCARE Act, 40 P.S. §§ 1303.101–1303.910.[1] Finding that the experts were qualified, we affirm.

¶ 2 Appellee Donald J. Smith ("administrator") filed a wrongful death and survival action on his own behalf and on behalf of the estate of his late wife, Maureen Smith ("decedent"), claiming that appellant/physicians and others breached the standard of care in failing timely to diagnose and treat decedent's small bowel leiomyosarcoma, thereby resulting in her untimely death. In support of his claim, administrator retained W. Stuart Battle, M.D., a board-certified general surgeon; and Allen Krutchik, M.D., a board-certified oncologist and

* Retired Justice assigned to Superior Court.

1. Medical Care Availability and Reduction of Error Act.

▊

internist. Appellant physicians, Matthew R. Astroff, M.D., and Richard D. Tolin, M.D., are board-certified gastroenterologists.

¶ 3 According to decedent's primary care physician, Nicholas C. Battafarano, M.D., because he was aware of the history of cancer in decedent's family, he immediately referred decedent to Timothy Fox., M.D., a general surgeon, when decedent presented at Dr. Battafarano's office on May 26, 1998 with rectal bleeding. (Deposition testimony of Nicholas Battafarano read into the record at notes of testimony, 11/18/03 at 150–151.) Decedent, who was 61 years old at the time, experienced a significant episode of rectal bleeding at Dr. Fox's office; therefore, he immediately admitted decedent to Paoli Memorial Hospital ("hospital") under his service as attending physician the same day. During her hospitalization, decedent received approximately three to four pints of blood.

¶ 4 Dr. Fox attempted to perform a colonoscopy, but due to equipment failure, called in Dr. Astroff and his group, Main Line Gastroenterology, to assist in the testing and diagnosis. Despite performing numerous tests, the physicians involved in decedent's care were unable to determine the exact cause of her bleeding; however, two tests indicated the probable source of the bleeding as the mid to distal ileum portion of the small bowel. Following her discharge, decedent underwent further outpatient tests in June of 1998, including an endoscopy, small bowel enteroclysis, and other tests; however, none of those tests established the cause of her bleeding. Because all of the tests the physicians performed viewed the inside of the colon and small bowel, however, none of the tests could rule out the possibility of an extrinsic tumor.

¶ 5 In November of 1998, decedent again experienced rectal bleeding and returned to hospital, where she was admitted under the service of Dr. Tolin, also of Main Line Gastroenterology. Dr. Tolin performed another colonoscopy and discharged decedent the next day with no definitive diagnosis, although he indicated the possibility of a "right-sided diverticulum." In November of 1999, decedent again experienced rectal bleeding and was admitted to hospital under Dr. Astroff's care. Following another colonoscopy, decedent was again discharged without a definitive diagnosis. According to Dr. Astroff, his working hypothesis during the November 1999 hospitalization was that decedent suffered from an arteriovenous malformation or AVM. AVM's, according to Dr. Astroff, are "like little dilated veins on your face, they are flat to the surface. It can't show something flat on the surface, so often when all the tests are done, if we find no other source, often we have to presume it was an AVM." (Notes of testimony, 11/17/03 at 145.)

¶ 6 Following an unrelated hospitalization in December 1999, decedent presented to Dr. Battafarano on March 25, 2000 with lower abdominal pain and fever and was admitted to hospital. A CT scan done the following day revealed a large pelvic and mesenteric mass extrinsic to the ileum of the small bowel. The tumor was diagnosed as a high-grade GIST, or stromal tumor of the gastrointestinal tract. Additional testing and surgery at Sloan–Kettering Memorial Hospital, to which decedent transferred, revealed the tumor was a leiomyosarcoma. Despite several surgeries, the cancer had metastasized to several of decedent's other organs, and she died on December 14, 2000.

¶ 7 On June 14, 2001, administrator filed a complaint sounding in negligence, naming numerous physicians, medical centers, medical practices, and hospital as defendants, and including counts for wrongful

death and survival. Administrator retained the services of the two expert medical witnesses noted *supra* to address the standard of care for determining the cause of occult gastrointestinal bleeding. Specifically, the experts addressed whether Drs. Tolin and Astroff, the two gastroenterologists ("gastroenterologists"), and others breached the standard of care by failing to order a CT scan to investigate the possibility of a source extrinsic to the GI tract. Dr. Battle filed his report on April 1, 2003 and Dr. Krutchik filed two reports, one on April 15, 2003, and one on October 31, 2003, after he had reviewed the reports of Emanuel Rubin, M.D., one of the gastroenterologists' experts, who determined that the tumor was a leiomyosarcoma, not a GIST.

¶ 8 It was not until November 4, 2003, however, ten days before trial commenced, that gastroenterologists filed their motion *in limine*, seeking to preclude administrators' experts from testifying based upon their purported lack of qualification pursuant to the MCARE Act. To support their motion, gastroenterologists appended their *curricula vitae* as well as those of Drs. Battle and Krutchik. (Plaintiff's Response to Motion *in Limine*, 11/10/03, R. at 55.) Administrator then filed a response, attaching the reports and *curricula vitae* of his two medical experts. The court heard argument on the motion after the jury had been selected, on November 14, 2003, after which it entered an order denying the motion. (Notes of testimony, 11/14/03 at 13–23.)

¶ 9 On November 25, 2003, following a jury trial during which several of the remaining defendants were granted motions for compulsory nonsuit or were dismissed by stipulation, the jury returned a verdict in favor of administrator, finding gastroenterologists negligent and apportioning 50 percent of the damages, or $500,000, to

each, for a total of $1,000,000. Gastroenterologists filed a post-trial motion on December 4, 2003, and administrator filed a motion for delay damages. The trial court granted administrator's motion and molded the verdict to $1,077,725.88.

¶ 10 According to the trial court, it did not decide the post-trial motion, however, because gastroenterologists failed to order the transcripts in a timely manner, thereby precluding the court from filing a briefing order and/or disposing of the motion within the prescribed 120 days. (Trial court opinion, 6/3/04 at 3 n. 1 and 2, 6.) Our review of the record indicates, to the contrary, that gastroenterologists included a request for transcripts with their December 4, 2003 post-trial motion and also moved for leave to specify additional grounds after the motion clerk notified counsel that the requested transcript had been transcribed. Additionally, administrator included in its response to the post-trial motion a motion that the entire transcript, including the arguments and objections of counsel and the rulings of the court, be transcribed. Administrator filed its response on December 12, 2003.

¶ 11 On December 6, 2004, having received the certified record as well as a motion from gastroenterologists' counsel for leave to complete the record, this court granted the motion and remanded to the trial court to complete the record. (Per curiam order, No. 1187 EDA 2004, 12/6/04.) Gastroenterologists' counsel then hand-delivered to the trial court a request for that court to forward numerous items that were missing from the certified record when this court received the record on November 23, 2004. Included among those items are both the post-trial motion and the response thereto. They are located in Part 3 of the certified record, but are not numbered.

¶ 12 Regardless of the cause, the post-trial motion was denied by operation of law on or about April 4, 2004, and administrator entered judgment on the verdict on April 6, 2004. This timely appeal followed, in which gastroenterologists raise the following issues:

A. DID THE LOWER COURT ERR IN FAILING TO AWARD DEFENDANTS RELIEF IN THE NATURE OF A JUDGMENT N.O.V. OR A NEW TRIAL AS THE VERDICT RENDERED WAS IMPROPER AND UNSUPPORTED BY THE REQUISITE COMPETENT EXPERT EVIDENCE?

1. Are defendants entitled to appellate relief since the trial court erred in denying their Motion in Limine and in allowing plaintiff's expert witnesses to testify against these healthcare providers, in contravention of Section 512 of Pennsylvania's Medical Care Availability and Reduction of Error Act,[Footnote 2] since those experts were not Board Certified or practicing in the field of gastroenterology or in a subspecialty with a substantially similar standard of care?

2. Are defendants entitled to appellate relief since, without competent expert testimony, plaintiff's case should not have reached a jury, and the healthcare providers are entitled to the entry of Judgment or, at a minimum, a new trial?

3. Are defendants entitled to appellate relief since the verdict rendered is against the overwhelming weight of the evidence as no two reasonable minds could disagree that, based upon the consensus statement of the American Gastroenterological Association,[Footnote 3] a CAT scan is not a diagnostic tool which is required by the standard of care for a gastroenterologist performing a work-up for occult and/or obscure bleeding?

B. DID THE LOWER COURT ERR AND ABUSE ITS DISCRETION IN REFUSING TO GRANT DEFENDANTS A NEW TRIAL OR A REMITTITUR BASED ON THE UNSUPPORTED AND EXCESSIVE AWARD?

[Footnote 2]   40 P.S. § 1303.512.

[Footnote 3]   R. 1021a.

Appellants' brief at 5.

¶ 13 "Decisions regarding admission of expert testimony, like other evidentiary decisions, are within the sound discretion of the trial court." *Weiner v. Fisher*, 871 A.2d 1283, 1285 (Pa.Super.2005), citing *Turney Media Fuel, Inc. v. Toll Bros., Inc.*, 725 A.2d 836, 839 (Pa.Super.1999). "We may reverse only if we find an abuse of discretion or error of law." *Id.* (citation omitted).

¶ 14 The issue regarding the experts' qualifications under the MCARE Act is, however, in essence a question of statutory interpretation. *Id.* As the *Weiner* court observed, "Since interpretation of a statute is a question of law, our review is plenary." *Id.*, citing *Commonwealth v. Gilmour Mfg. Co.*, 573 Pa. 143, 148, 822 A.2d 676, 679 (2003). We are, therefore, bound by the rules of statutory interpretation, "particularly as found in the Statutory Construction Act. 1 Pa. C.S.A. §§ 1501–1991." *Id.* As the *Weiner* court continued, "The goal in interpreting any statute is 'to ascertain and effectuate the intention of the General Assembly.'" *Id.*, quoting 1 Pa.C.S.A. § 1921(a). As

noted in *Weiner,* "Our Supreme Court has stated that the plain language of a statute is in general the best indication of the legislative intent that gave rise to the statute." *Id.,* citing *Gilmour, supra* at 148, 822 A.2d at 679. The *Weiner* panel, citing several cases, therefore observed, "When the language is clear, explicit, and free from any ambiguity, we discern intent from the language alone, and not from arguments based on legislative history or 'spirit' of the statute." *Id.* at 1285–1286, citing 1 Pa.C.S.A. § 1921(b) (other citations omitted).

¶ 15 The portions of the MCARE Act relevant to this case follow:

§ 1303.512. **Expert qualifications**

(a) **General rule.**—No person shall be competent to offer an expert medical opinion in a medical professional liability action against a physician unless that person possesses sufficient education, training, knowledge and experience to provide credible, competent testimony and fulfills the additional qualifications set forth in this section as applicable.

(b) **Medical testimony.**—An expert testifying on a medical matter, including the standard of care, risks and alternatives, causation and the nature and extent of the injury, must meet the following qualifications:

(1) Possess an unrestricted physician's license to practice medicine in any state or the District of Columbia.

(2) Be engaged in or retired within the previous five years from active clinical practice or teaching.

Provided, however, the court may waive the requirements of this subsection for an expert on a matter other than the standard of care if the court determines that the expert is otherwise competent to testify about medical or scientific issues by virtue of education, training or experience.

(c) **Standard of care.**—In addition to the requirements set forth in subsections (a) and (b), an expert testifying as to a physician's standard of care also must meet the following qualifications:

(1) Be substantially familiar with the applicable standard of care for the specific care at issue as of the time of the alleged breach of the standard of care.

(2) Practice in the same subspecialty as the defendant physician or in a subspecialty which has a substantially similar standard of care for the specific care at issue, except as provided in subsection (d) or (e).

(3) In the event the defendant physician is certified by an approved board, be board certified by the same or a similar approved board, except as provided in subsection (e).

. . . .

(e) **Otherwise adequate training, experience and knowledge.**—A court may waive the same specialty and board certification requirements for an expert testifying as to a standard of care if the court determines that the expert possesses sufficient training, experience and knowledge to provide the testimony as a result of active involvement in or full-time teaching of medicine in the applicable subspecialty or a related field of medicine within the previous five-year time period.

40 P.S. § 1303.512(a), (b), (c), and (e).

¶ 16 In this case, the trial court determined that both Drs. Battle and Krutchik met the requirements of subsections (c)(1) and (2), and apparently of subsection (e). (Trial court opinion, 6/3/04 at 4.) The trial court based its conclusion on the *curricula vitae* and reports of the two experts, which were the only evidence available to the court when it decided the

motion *in limine.*[2] The sum and substance of the trial court's analysis follows:

> [Dr. Battle] is board certified in surgery, which overlaps with gastroenterology for the specific care at issue in this case. [Dr. Krutchik] is board certified in medical oncology, which is a subspecialty of internal medicine, which has a substantially similar standard of care as gastroenterology for the specific care at issue in this case. In addition, both doctors are actively involved in the treatment of patients with gastrointestinal bleeding and cancers.

*Id.* at 4–5.

¶ 17 We find support for the trial court's order denying the motion *in limine* in the MCARE Act and in the administrator's experts' testimony with regard to both their qualifications and the substantive issue administrator asked them to address.

¶ 18 Dr. Krutchik testified that an oncologist is "a physician who has a background in adult and internal medicine who then does a two-year specialty training program post-graduate at a cancer center and is trained in the diagnosis, management and treatment of all adult cancers and malignancies and related disorders." (Notes of testimony, 11/18/03 at 6.) As part of his post-doctoral training, Dr. Krutchik rotated through the different specialties of oncology, including gastrointestinal oncology and sarcoma. (*Id.* at 8.) Additionally, Dr. Krutchik testified he sees "all kinds of patients," including patients with various gastrointestinal cancers, including soft tissue sarcoma. (*Id.* at 15.)

¶ 19 In addition to his full-time practice as an oncologist, Dr. Krutchik is a clinical assistant professor of medicine at a medical college, instructing third-year medical students who rotate through his practice in examination, diagnosis, and management of patients with various cancers. (*Id.* at 9–10.) He had also published a paper on all types of sarcoma, including soft tissue sarcoma and small bowel sarcoma. (*Id.* at 31.)

¶ 20 With regard to whether there would be an overlap in the standard of care among physicians specializing in different areas who are diagnosing a 61–year–old woman with gastrointestinal bleeding, Dr. Krutchik opined:

> Yes, there's a significant overlap because physicians are trained, whether it's a surgeon or an internist or a gastroenterologist or oncologist to diagnose signs and symptoms and then develop a list [sic] will have diagnosis that one has to work through, which is called a differential diagnosis, so this crosses all boundaries. It's not unique to any specialty.
>
> . . . .
>
> The standards would be the same because internists, surgeons, gastroenterologists, who are internists [are] all involved in the treatment of cancer and non-cancer related problems, so one has to be familiar with the different diagnoses and then be prepared to deal with it.

*Id.* at 17.

¶ 21 Dr. Battle, a board-certified general surgeon, testified that general surgery is a subspecialty within surgery and deals with the diagnosis and treatment of diseases which primarily involve the breast; the abdominal cavity, including the liver, the

---

**2.** *See Wexler v. Hecht,* 847 A.2d 95, 105 n. 7 (Pa.Super.2004) (noting, "We stress we do not condone the practice of relying solely on an expert's *curriculum vitae* when determining whether he or she is competent to testify. Rather, the better practice is for trial courts to take evidence directly from the expert before ruling on the issue."), *allocatur granted,* 583 Pa. 700, 879 A.2d 1258 (2005).

spleen, the stomach, the esophagus, and the small and large bowel; the thyroid; burns; shock and trauma, including gunshot wounds and automobile accidents; and vascular surgery. (Notes of testimony, 11/19/03 at 6–7.) According to Dr. Battle, "most of the cancer surgery in this country is done by general surgeons; that is, thyroid glands, breasts, all of the intra-abdominal organs, like cancer of the stomach, cancer of the small and large bowel." (*Id.* at 14.)

¶ 22 Dr. Battle testified that his personal experience over the past 33 years had been diagnosing and treating cancers of the intra-abdominal organs, specifically the gastrointestinal tract, the thyroid, and skin cancers such as melanoma and smaller cancers of the skin. (*Id.*) Dr. Battle had been a member of the American Society of Gastrointestinal Endoscopy for over 30 years, and had received all of their publications up until the year of trial. (*Id.* at 22.) He also testified that he was familiar with the standard of care for the evaluation and work-up of a 60–year–old woman with GI bleeding. (*Id.*)

¶ 23 According to Dr. Battle, the standard would be no different for him as a surgeon than it would be for a gastroenterologist because "[i]t has traditionally been the purview of both the [general surgeon] and a gastroenterologist .... The problem of bleeding from the gastrointestinal tract is addressed by either specialty and both specialties are knowledge[able] and well-trained in the diagnosis and treatment of those diseases." (*Id.* at 15.) As Dr. Battle explained, "The surgeons actually end up operating sometimes on people with GI bleeding. Gastroenterologists these days can stop GI bleeding through the scopes that they put down, so it's sort of a joint, certainly a big overlap area in that disease process." (*Id.* at 16.)

¶ 24 We agree with the trial court that with regard to the specific issue this case presents, the standard of care when presented with a patient with obscure GI bleeding, administrator's experts' expertise overlapped with the expertise of gastroenterologists for purposes of the MCARE Act. As this court noted in *Weiner, supra,* "Internal medicine is a specialty, of which gastroenterology is a subspecialty. To be certified in gastroenterology, a physician must first be certified in internal medicine." *Weiner,* 871 A.2d at 1289 n. 8.

¶ 25 In *Weiner,* this court concluded the trial court erred in disqualifying an expert because he did not teach a specific diagnostic technique within the subspecialty of gastroenterology, when he was offered as an expert in gastroenterology to address the standard of care applicable when a patient presented to a gastroenterologist with certain symptoms and a family history of gastrointestinal cancer. *Id.* at 1289. The *Weiner* court therefore remanded the case because the record was insufficient to establish the extent, level, or frequency of the expert's teaching activities. *Id.*

¶ 26 In this case, unlike *Weiner,* the experts do not claim to possess expertise in the subspecialty of gastroenterology. Rather, they claim their specialties and/or subspecialties overlap with that of gastroenterology as to the standard of care applicable when a patient presents to *any* appropriately trained medical care provider with an obscure GI bleed. Recently, this court addressed a similar set of facts in *Herbert v. Parkview Hospital,* 854 A.2d 1285 (Pa.Super.2004), *appeal denied,* 582 Pa. 710, 872 A.2d 173 (2005).

¶ 27 In *Herbert,* the patient had a history of end-stage renal failure and had been seen by a nephrologist for some period of time as a result. Patient's wife called for emergency transportation when she found patient on the floor of the kitchen, breath-

ing heavily. He was admitted to intensive care at Parkview Hospital through the emergency room, where it was noted that patient was "breathing funny" and had to be placed in restraints because he was grasping at his throat in the ICU. *Id.* at 1286.

¶ 28 The following day, the nephrologist saw patient in order to prepare him for inpatient dialysis but did not examine patient's throat or mouth. The day after the nephrologist's visit, patient underwent an emergency intubation, during which a large piece of steak was removed from patient's throat. Despite the intubation, patient developed an infection at the site and died eight days later. *Id.* at 1287. The administratrix of patient's estate filed suit against Parkview and various health care providers, including the nephrologist, and called as an expert a specialist in internal medicine ("internist") to testify as to the applicable standard of care for the nephrologist under the facts of the case. Nephrologist argued that the MCARE Act required administratrix to present the testimony of a nephrologist to demonstrate that nephrologist breached the standard of care applicable to a nephrologist treating a patient in the context of a nephrology examination, when he failed to address patient's airway blockage. *Id.* at 1291.

¶ 29 In addressing the admissibility of the internist's testimony, the *Herbert* panel focused on the language of the MCARE Act requiring that the expert be familiar with the standard of care *for the specific care at issue* and practice in the same or a substantially similar subspecialty which has a substantially similar standard of care *for the specific care at issue. Id.* at 1292, quoting 40 P.S. § 1303.512(c)(1) and (2) (emphasis in *Herbert* ). According to the internist, any physician with specialized training and certification in internal medicine, of which nephrology is a subspecialty,

should have noted anomalies in patient's behavior and the notes in the chart concerning patient's symptoms and behavior and concluded that patient's respiratory problems needed immediate attention. *Id.* at 1292–1293.

¶ 30 As the *Herbert* panel opined, "The MCARE Act plainly prefers, and in some cases may require, that expert testimony in professional medical malpractice cases come from witnesses with expertise in the defendant's particular subspecialty." *Id.* at 1294, citing 40 P.S. § 1303.512(c). The *Herbert* panel declined to hold that the Act required that testimony in all cases be so restricted, observing, "The 'same subspecialty' ideal contained in § 1303.512(c)(2) includes an express caveat, reflecting the Legislature's decision to afford the trial court discretion to admit testimony from a doctor with expertise in another specialty that 'has a similar standard of care *for the specific care at issue.*' " *Herbert*, 854 A.2d at 1294, quoting 40 P.S. § 1303.512(c)(2) (emphasis in *Herbert* ).

¶ 31 According to *Herbert*, "This reading comports with Pennsylvania courts' historical deference to trial courts' discretion in deciding whether to admit evidence at trial and is consistent with the plain language of the statute itself." *Id.* As this court observed in *Herbert*, "Indeed, the wisdom of restricting expert testimony to that of a nephrologist in this case might credibly be questioned, where 'the specific care at issue' is the *failure* to provide care in the presence of an allegedly clear respiratory problem the likes of which [internist] testified should have been obvious to [nephrologist]." *Id.* (emphasis in *Herbert* ).

¶ 32 We recognize the analytical distinctions between this case and *Herbert,* as gastroenterology is not a subspecialty of oncology or general surgery. It is, however, a subspecialty of internal medicine, in which Dr. Krutchik is board-certified.

Furthermore, Dr. Battle's credentials as a general surgeon specializing in, *inter alia,* gastrointestinal surgery, who kept current with the field of gastroenterology in part by maintaining membership in the American Society of Gastrointestinal Endoscopy, which publishes a journal Dr. Battle received for 30 years, indicate his subspecialty is similar to that of gastroenterologists for the specific care at issue. As a panel of this court recently observed in the context of a psychiatrist whose testimony was excluded when he was called as an expert to testify as to the standard of care applicable to a resident who prescribed intravenous Ativan to treat a patient's anxiety, "[I]t is clear that the excluded testimony concerns the standard of care applicable to *any* physician who prescribes Ativan to treat anxiety." *Campbell v. Attanasio,* 862 A.2d 1282, 1289 (Pa.Super.2004) (emphasis in *Campbell*), *appeal denied,* ―― Pa. ――, 881 A.2d 818 (2005), *and appeal denied,* ―― Pa. ――, 881 A.2d 818 (2005).

¶ 33 Gastroenterologists claim, however, that because neither of administrator's experts was familiar with an algorithm compiled by the American Gastroenterological Association as a consensus statement regarding the guideline for examinations when evaluating patients with obscure GI bleeding, it was clear neither was familiar with the standard of care applicable to gastroenterologists. (Appellants' brief at 41.) The algorithm, in the form of a flow chart, posits various scenarios and suggests the appropriate diagnostic test or tool to pursue based on the scenario applicable to the particular patient. (Exhibit D–1, R. at Exhibits envelope, R.R. at 1021a.) According to gastroenterologists, the algorithm, which does not mention ordering a CT scan, constitutes the standard of care for board-certified gastroenterologists; therefore administrator's experts, who were not familiar with the algorithm, were not aware of the applicable standard of care. (Appellants' brief at 47–48.)

¶ 34 Our review of both experts' testimony indicates, however, that although they were unfamiliar with the particular journal article to which the algorithm was appended, they were familiar with the purpose of algorithms, which, as Dr. Krutchik testified, are not limitations on what a doctor can do but are guides, which allow the doctor to use judgment and explore other options outside the algorithm. (Notes of testimony, 11/18/03 at 136.) As Dr. Krutchik also testified, there was much more to the article than the algorithm, concerning other testing, including a CT scan, that should be done as part of a preoperative evaluation, where, as in this case, the bleeding repeated and the tests within the algorithm were unable to determine its cause. (*Id.* at 112, 137). As Dr. Krutchik observed, a progress note on the hospital chart for May 30, 1998 indicated surgery was contemplated at that time, as it read, "continued slow GI bleed discuss possible need for ileocolectomy." (*Id.* at 141.) It was only because decedent's bleeding stopped the next day that she was discharged.

¶ 35 Dr. Krutchik also referred specifically to a table in the same article in which the algorithm appeared with two columns, one for causes of obscure GI bleeding within reach of an upper endoscopy, and one for causes that are beyond reach of an upper endoscopy, as in this case. (*Id.* at 137.) The second cause shown in the relevant column was tumor, footnoting leiomyosarcomas and soft tissue sarcomas. (*Id.* at 138.)

¶ 36 Dr. Battle likewise indicated his familiarity with algorithms as a guide, stating that physicians do not practice medicine by a cookbook or algorithms, but consider anything on a list of differential

diagnoses and rule out the most life-threatening first. (Notes of testimony, 11/19/03 at 115.) According to Dr. Battle, the source of the bleeding was established in May of 1998 when both a nuclear medicine bleeding study and a Meckel's scan, performed two days apart, indicated that blood was pooling in the right lower quadrant of the abdomen, in the area of the mid to distal ileum. (*Id.* at 42–43, 48, 66.)

¶ 37 As a result, according to Dr. Battle, having ruled out almost all intrinsic causes for the bleeding by performing all of the tests they did, which were within the algorithm, gastroenterologists breached the standard of care by failing to look for an extrinsic cause, such as a small tumor near the source of the bleeding. As Dr. Battle opined, while a really small tumor would not have appeared on a CT scan, a tumor large enough to create bleeding probably would have appeared. (*Id.* at 87.) As Dr. Battle therefore observed, "The location—that's the frustrating thing, here the location was diagnosed and the CAT scan would have diagnosed it definitively." (*Id.* at 118.)

¶ 38 Dr. Krutchik echoed Dr. Battle's analysis, observing that a differential diagnosis to explain bleeding from the small intestine would include looking for both an intrinsic and an extrinsic tumor. (Notes of testimony, 11/18/03 at 47.) Dr. Krutchik also observed that a two-centimeter tumor outside the bowel would be unlikely to cause deformity inside the bowel, but would cause bleeding, which, like a pin prick, would stop and would not show up on tests of the inner bowel. (*Id.* at 47–48, 123.) Additionally, Dr. Krutchik agreed with Dr. Battle that a tumor large enough to cause bleeding would be at least one centimeter, and would therefore show up on a CT scan. (*Id.* at 129.) Dr. Krutchik

also opined that working backward from the size of the tumor in March of 2000, the tumor must have been within the range of one to two centimeters in May of 1998. (*Id.* at 116.)

¶ 39 From the foregoing, it is evident that both of administrator's experts were substantially familiar with the applicable standard of care for the specific care at issue and practiced in a subspecialty with a substantially similar standard of care for the specific care at issue. 40 P.S. § 1303.512(c)(1), and (2). *See Gartland v. Rosenthal,* 850 A.2d 671, 673, 675–676 (Pa.Super.2004) (opining that a neurologist was qualified to testify as to the standard of care for a radiologist reading a CT scan of the brain where the specific treatment at issue was failure to report on the possibility of a tumor and to recommend an MRI). Additionally, while Drs. Battle and Krutchik were not board-certified gastroenterologists, they were, if not certified by a similar board pursuant to subsection (c)(3), certainly actively involved and/or teaching in a related field of medicine so as to possess sufficient training, experience, and knowledge to provide testimony, pursuant to subsection (e).

¶ 40 We also find misplaced gastroenterologists' heavy reliance on *Wexler v. Hecht,* 847 A.2d 95 (Pa.Super.2004), *allocatur granted,* 583 Pa. 700, 879 A.2d 1258 (2005). This court in *Wexler* found no abuse of discretion in the trial court's decision to preclude the testimony of plaintiff's expert, a podiatrist, in part because a podiatrist does not possess an unrestricted physician's license to practice medicine, as required by 40 P.S. § 1303.512(b)(1). There is no dispute in this case as to administrator's experts' license to practice medicine.[3]

---

3. We note additionally that this court in *Wexler* reviewed the trial court's decision and

affirmed based on the common law, but then added its discussion of the MCARE Act under

¶ 41 Having found no merit to the first part of the first issue gastroenterologists raise, we must necessarily also find no merit to the second part of that issue: that they are entitled to appellate relief because administrator did not present competent expert evidence. Likewise, we find no merit to the third part of the first issue, claiming entitlement to relief because the verdict was against the overwhelming weight of the evidence and "no two reasonable minds could disagree that, based upon the consensus statement of the American Gastroenterological Association, a CAT scan is not a diagnostic tool which is required by the standard of care for a gastroenterologist performing a work-up for occult and/or obscure bleeding." (Appellants' brief at 5.)

¶ 42 We have already addressed the role the algorithm played in this case and find that reasonable minds could, and did, disagree as to whether a single guideline, even a consensus statement, included in a single journal article addressing a complex of issues related to treating obscure/occult bleeding, can be isolated from its context and held forth as the standard of care for a subspecialty. As we have already noted, both Drs. Krutchik and Battle referred to other parts of the same article, which indicated the need for "specific management" for the particular patient; indeed, even the algorithm directed physicians to "specific management" in every case except where there was no recurrence of the bleeding. (Notes of testimony, 11/18/03 at 137–138; 11/19/03 at 116; Exhibit D–1, R. at Exhibits envelope, R.R. at 1021a.) As Dr. Battle so poignantly opined:

> If you follow this [algorithm] in every instance and you didn't end up doing a

the facts of that case. As the *Wexler* court observed, the trial court did not allow the parties to litigate the question whether the expert's testimony was admissible under the

CAT scan, everybody like Mrs. Smith is going to die. Everybody with her GI bleeding will die if you stick by that the way you're presenting it. If you don't interpret it the way physicians would interpret it, everybody like Mrs. Smith are [sic] going to die from their tumors, so that is just not acceptable.

Notes of testimony, 11/19/03 at 113.

■ ¶ 43 Gastroenterologists' second issue claims they are entitled to a new trial or remittitur based upon the unsupported and excessive jury verdict. As a panel of this court recently opined:

> In *Tulewicz v. Southeastern Pennsylvania Transportation Authority*, 529 Pa. 584, 606 A.2d 425 (1991), our Supreme Court articulated the standard for setting aside a verdict as excessive:
>
>> The Court is not warranted in setting aside, reducing, or modifying verdicts for personal injuries unless unfairness, mistake, partiality, prejudice, or corruption is shown, or the damages appear to be grossly exorbitant. The verdict must be clearly and immoderately excessive to justify the granting of a new trial. The amount must not only be greater than that which the court would have awarded, but so excessive as to offend the conscience and judgment of the Court.
>
> *Id.* at 586, 606 A.2d at 426, quoting *Stark v. Lehigh Foundries*, 388 Pa. 1, 23, 130 A.2d 123, 135 (1957).

*Bennyhoff v. Pappert*, 790 A.2d 313, 321 (Pa.Super.2001), *appeal denied*, 573 Pa. 682, 823 A.2d 143 (2003), quoting *Toogood v. Owen J. Rogal, D.D.S., P.C.*, 764 A.2d 552, 560 (Pa.Super.2000), *reversed on other grounds*, 573 Pa. 245, 824 A.2d 1140 (2003).

MCARE Act; therefore, the issue was not raised in post-trial motions. *Wexler*, 847 A.2d at 102.

¶ 44 We agree with administrator that in this case, gastroenterologists do not cite to a single piece of evidence to support their claim that the verdict was excessive. According to the trial court, "Mrs. Smith, as a result of Defendant Doctors['] failure to perform a CT scan which would have revealed the mass that was causing her gastrointestinal bleeding, was caused to endure months of interventions, hospitalizations, suffering, further surgery and death." (Trial court opinion, 6/3/04 at 5.) The court therefore opined that it could not find the verdict to be so excessive as to offend the conscience and judgment of the court. (*Id.*)

¶ 45 We find record support for the trial court's decision and therefore no abuse of discretion. Decedent was 61 years old when she had her first episode of GI bleeding. According to one of her sons, she was actively involved in the family business, in which she had worked for nine or ten years prior to her illness, as well as in the lives of her four children and seven grandchildren. (Notes of testimony, 11/18/03 at 156–159.) She had a very close bond with one granddaughter in particular, and held herself back from spending more time with her grandchildren. (*Id.* at 158.) She also loved to travel, go to New York to see Broadway plays, and go out to dinner, so much so that she was hard to keep track of. (*Id.*) She was, according to her son, "a sort of force of the family, force of nature .... She was very strong, very loving mother and we respected her greatly." (*Id.* at 157.)

¶ 46 Decedent's husband of 44 years, administrator herein, introduced into evidence a picture of decedent with her family in May 2000, after she was diagnosed, in which she still appeared healthy. (Notes of testimony, 11/17/03 at 100, Exhibit P–2, R. at Exhibit envelope, R.R. at 1248a.)

According to administrator, however, by August, when decedent's symptoms recurred, administrator took her to Sloan–Kettering for some experimental treatment where it was determined the tumor had grown back even larger than the first time, so she underwent a second surgery. (Notes of testimony, 11/17/03 at 119–120.) From that point on, decedent was in a great deal of discomfort, could not eat, and could not sleep well. (*Id.* at 121–122.) She was readmitted to Sloan–Kettering in November, where she remained until two days before her death, when she was released to hospice care at home. During the period March through December 2000, administrator cared for decedent.

¶ 47 Son testified that during the years 1998 to 2000, decedent masked her fear with humor to protect her family. (Notes of testimony, 11/18/03 at 159.) Even after she was diagnosed, when she was in a fairly significant amount of pain, she tried to shield her family. (*Id.* at 161.) According to the medical experts, decedent underwent additional surgeries after the first surgery; and chemotherapy, some of which was experimental. A feeding tube was inserted for nutrition; a nephrostomy tube was inserted for urination; a nasogastric tube was inserted to drain fluids; and a substantial amount of pain medication, which can sedate or induce sleep or coma was administered for comfort during the ten months between decedent's diagnosis and her death. (Notes of testimony, 11/18/03 at 85–90; Plaintiff's Exhibit 22, Discharge Summary from Sloan–Kettering Memorial Hospital, 12/12/00, R. at Exhibit envelope, R.R. at 1268a–1270a.)

¶ 48 For all of the foregoing reasons, we affirm the judgment entered in favor of administrator and against gastroenterologists in the amount of $1,077,725.28.

¶ 49 Judgment affirmed.[4]

---

4. We have not considered gastroenterologists' post-submission communication, a recent opinion in the form of a memorandum and order filed in the U.S. District Court for the Eastern District of Pennsylvania, because that opinion serves as no more than persuasive authority if we choose to consider it so. *See*

*Hess v. Gebhard & Co. Inc.*, 570 Pa. 148, 161, 808 A.2d 912, 919 (2002) (observing the court was considering "several federal decisions that are not binding on this Court, but provide persuasive authority" in that case of first impression).