J.A02042/16

2016 PA Super 190

| MARY JANE FREY | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| v. | : | |
| | : | |
| ROBERT POTORSKI, M.D. | : | |
| | : | |
| | : | No. 1161 MDA 2015 |

Appeal from the Judgment Entered June 19, 2015
in the Court of Common Pleas of Luzerne County Civil Division
at No(s): 2008-03655

BEFORE: PANELLA, STABILE, and FITZGERALD,* JJ.

OPINION BY FITZGERALD, J.:      **FILED AUGUST 26, 2016**

Appellant, Mary Jane Frey, administratrix of the Estate of Richard John Frey ("Decedent"), appeals from the judgment entered in the Luzerne County Court of Common Pleas in this medical malpractice action. Appellant claims the trial court erred in allowing a hematologist, Henry M. Rinder, M.D., to testify regarding the standard of care for Appellee, Robert Potorski, M.D., an interventional cardiologist. We hold that the trial court properly determined that Dr. Rinder was qualified to testify under the Medical Care Availability and Reduction of Error Act ("MCARE Act"), 40 P.S. § 1303.512, and any error in the admission of his testimony was harmless in light of the substantially similar testimony of another qualified expert regarding the standard of care. Therefore, we affirm.

---

* Former Justice specially assigned to the Superior Court.

J.A02042/16

The trial court summarized the facts as follows:

This case involves a medical professional liability action arising out of the death of a 51 year old male following an arterial dissection, angioplasty and stenting procedure performed on March 28, 2006. [Decedent] underwent a cardiac catheterization and a subsequent intervention performed by [Appellee] Dr. Robert Potorski. The doctor intended to stent a narrowing in the ramus branch.

At the beginning of the intervention, [Decedent] was administered Plavix and 5000 units of Heparin. Two stents were placed into the ramus. During the intervention a left main artery dissection occurred. At the end of the dissection repair, [Appellee] added ReoPro [an anticoagulation drug]. Following the procedures, [Decedent] was returned to the cath lab after experiencing chest pain and EKG changes. [Appellee] inserted another stent into the left main to treat the dissection.

When [Decedent] was returned to the cath lab, it was determined that the left main had closed. An intra aortic balloon pump was inserted. A determination was made, due to the prior medical history of [Decedent], by a cardiothoracic surgeon that [Decedent] was not a surgical candidate. [Decedent] remained hospitalized at Wilkes-Barre General Hospital until March 31, 2006 during which time the intra aortic balloon pump was removed. [Decedent] was then transferred to Hospital of University of Pennsylvania (HUP) where he underwent PCTA [Percutaneous Transluminal Coronary Angioplasty], Intra-Aortic Balloon Pump (IABP), Left Ventricular Assistant Device and cardiac transplant. He died on May 31, 2006.

Prior to trial[1] [Appellant] filed a Motion in Limine to preclude the testimony of Dr. Henry Rinder from offering opinions on whether [Appellee's] administration of anticoagulants prior to the start of the Percutaneous

_____

[1] Appellant filed a complaint on April 29, 2008, seeking damages for the care rendered during the March 28, 2006 cardiac intervention and the delay in transferring Decedent to HUP.

- 2 -

Coronary Intervention (PCI) was in accordance with the standard of care. After argument on December 23, 2014, the Court denied [Appellant's] Motion in Limine ruling that the hematology and cardiology fields of medicine are substantially similar in the area in which Dr. Rinder would testify per his report.

Trial Ct. Op., 6/26/15, at 1-2.

A jury trial was held in January 2015. During *voir dire*, Dr. Rinder detailed his relevant experience. Dr. Rinder is a Professor of Hematology and the Director of the Clinical Hematology Laboratory at the Yale School of Medicine. N.T., 1/21/15, at 8-9. He and Appellee are board certified in internal medicine. *Id.* at 14. Dr. Rinder's particular expertise lies in the treatment of clotting, coagulation, bleeding, thrombosis, and general blood disorders. *Id.* at 3. As part of his practice, he frequently consults with interventional cardiologists regarding the necessary levels of anticoagulation to be administered to patients undergoing cardiac procedures, like that undertaken by Decedent. *Id.* at 15-16. At trial, Dr. Rinder specifically opined that Appellee's administration of anticoagulation drugs was appropriate and in conformity with the standard of care:[2]

> [Appellee's counsel]: Now Doctor, the jury has before it your education your training and background, and your understanding of the treatment and the medications that were administered to [Decedent] in advance of the PCI procedure in this case. Do you have an opinion, sir, that you hold with a reasonable degree of medical certainty as to whether or not the anticoagulation drugs that were

---

[2] Appellant objected to Dr. Rinder's testimony regarding the standard of care, but the trial court overruled the objection. N.T., 1/21/15, at 33.

administered to [Decedent] prior to the start of the intervention to the ramus comported with the standard of care?

* * *

[Dr. Rinder]: In my experience as a hematologist, in consultation with multiple types of these cases working with interventional cardiologists, these drugs are both appropriate and their dosing is appropriate, and it follows the standard of care for such an interventional procedure.

[Appellee's counsel]: Doctor, similarly, do you have an opinion that you hold with a reasonable degree of medical certainty as to whether the drugs that were administered to [Decedent] prior to the start of the interventional procedure to the ramus, do you have an opinion that you hold with a reasonable degree of medical certainty whether those dosages and selections of drugs would produce an anti-thrombolytic status and were appropriate anti-thrombosis drugs for [Decedent]?

[Dr. Rinder]: Yes. To a reasonable degree of medical certainty, again, as a hematologist working with interventional cardiologists in this area, and having a lot of experience with them, these dosages of drugs should be completely effective at blocking thrombin activity and at inhibiting platelet activity, and that they will be effective at preventing ischemic complications.

*Id.* at 32-34.

Further, Dr. Rinder refused to opine on areas he deemed outside his expertise on cross-examination:

[Appellant's counsel]: So the question that I had for you, Doctor, was are you aware with these procedures, with these interventions, that if there is a space between the stent and the wall of the artery, that . . . is an area for clot buildup?

[Dr. Rinder]: I'm not expert enough in understanding the placement of stents, the anatomy of the coronaries and

the anatomy of a dissection to be able to comment on that.

[Appellant's counsel]: Are you able to comment upon whether . . . well, I'll frame it this way. Heparin does not get rid of existing clot, correct?

[Dr. Rinder]: I would have to disagree with that.

[Appellant's counsel]: Does a dissection increase the risk for clotting?

[Dr. Rinder]: Again, the anatomy of a dissection and the types of dissections. I'm not expert enough to be able to weigh in on that.

*Id.* at 86.

Appellant presented the deposition testimony of Andrew P. Selwyn, M.D., an interventional cardiologist. Dr. Selwyn opined that Appellee had violated the standard of care by failing to conduct a test to determine Decedent's actual activated clotting time ("ACT") after receiving heparin but before the start of the PCI procedure. N.T., 1/8/15, at 109-10. Dr. Selwyn explained that a state of therapeutic anticoagulation is essential before a PCI procedure because when blood is in contact with foreign material, clot formation is likely. *Id.* at 101. Dr. Rinder was asked about the ACT test and acknowledged that he is not an interventional cardiologist on cross-examination:

[Appellant's counsel]: Not only wasn't there one measured, you cannot tell us-you can't look at a person and say, oh, I'm looking at you, your ACT would be-and then supply a specific number, correct?

[Dr. Rinder]: No. All I can say is that the dose of Heparin that was given, and the fact that there was no clotting on any of the wires or catheters in the first procedure, would suggest that he was fully anticoagulated by Heparin.

[Appellant's counsel]: Doctor, my question was-My question to you is, see if you can agree with me on this, you cannot tell me the ACT level for [Decedent] at any time between the time that Heparin was given and the time of the dissection, correct?

[Dr. Rinder]: I cannot assign a number.

* * *

[Dr. Rinder]: . . . I think cardiologists-and again, I'm not a cardiologist, but I understand from them that they get the ACT for many different reasons and I can't speculate as to those.

N.T., 1/21/15, at 71-72.

On day prior to Dr. Rinder's testimony, Appellee presented the testimony of Joel K. Kahn, M.D., an interventional cardiologist. Dr. Kahn also opined that Appellee did not violate the standard of care in his administration of anticoagulants prior to the PCI procedure. Moreover, Dr. Kahn emphasized that Appellee was not required to obtain an ACT test under the standard of care:

[Appellee's counsel]: Do you have an opinion, Doctor, that you hold with a reasonable degree of medical certainty, as to whether or not Dr. Potorski deviated from the standard of care in failing to secure an ACT test of [Decedent] before he actually started the intervention to the ramus?

[Dr. Kahn]: I do have an opinion, and it's that it was not required by the standard of care to determine an ACT at the time point you're talking about.

[Appellee's counsel]: Can you explain to the ladies and gentleman of the jury why?

[Dr. Kahn]: Yes. I mean, one, [Decedent] was properly prepared in that he came to the cath lab on daily aspirin, which is necessary. And he also, in a way that exceeded the standard of care, had already gotten Plavix 600 milligrams before the stent program was embarked upon. So he actually had two antiplatelet agents orally onboard. And 5,000 units of Heparin is in fact my standard dosing. Many of us have practiced in days before there were ACT's and know that it is available but it's not a necessary portion of successful angioplasty and stenting. And it was an adequate dose, and [Decedent] adequately pretreated with other agents that thinned the blood, and one can be confident that one will have a good outcome and a good antithrombotic program.

N.T., 1/20/15, at 38-39.

On cross-examination, Dr. Kahn reiterated that in his opinion, Appellee met the standard of care regarding the administration of anticoagulation agents, regardless of an ACT test:

[Appellant's counsel]: Would you agree with me that if [Appellee] did not do an ACT, that [Appellee] deviated from reasonable care?

[Dr. Kahn]: I would not agree with that.

*     *     *

[Appellant's counsel]: So at Beaumont Hospital, the Hospital of the University of Pennsylvania, at Brigham and Women's, and Dr. Selwyn says it's all across the country, but you're telling us that not to perform that does not represent a deviation from reasonable care, that's what you want this jury to believe?

[Dr. Kahn]: If adequate antiplatelet agents and antithrombotic agents were administered, which is the case here.

*Id.* at 102-103.

On January 23, 2015, the jury returned a unanimous defense verdict. On February 2, 2015, Appellant filed a motion for a new trial alleging that Dr. Rinder, as a hematologist, was not qualified to testify regarding the standard of care for Appellee, an interventional cardiologist. The trial court denied Appellant's motion and, in a June 26, 2015 memorandum opinion, determined that Dr. Rinder was qualified to testify pursuant to the MCARE Act, and any error in admitting this evidence was harmless because the testimony was substantially similar to that of defense expert, Dr. Kahn.

Appellant filed a court-ordered Pa.R.A.P. 1925(b) statement and the instant timely appeal followed wherein Appellant sets forth the following issues for review:

> 1. Whether [Appellee's] expert, a physician who claimed expertise as a pathologist and hematologist, was qualified to testify as to standard of care in favor of an interventional cardiologist under Section 512 (c), 40 P.S. § 1303.512?
>
> 2. Whether the Trial Court committed reversible error in permitting [Appellee's] expert, a physician who claimed expertise as a pathologist and hematologist, to testify regarding the standard of care of [Appellee], an interventional cardiologist, under Section 512 (c), 40 P.S. § 1303.512?
>
> 3. Whether the Trial Court committed reversible error in permitting [Appellee's] expert, a physician who claimed expertise as a pathologist and hematologist, to testify regarding the standard of care of [Appellee], an

interventional cardiologist, under Section 512 (e), 40 P.S. § 1303.512?

4. Whether Appellant was prejudiced or harmed by the Trial Court's decision to permit [Appellee's] expert, a physician who claimed expertise as a pathologist and hematologist, to testify regarding the standard of care of [Appellee], an interventional cardiologist, under either Section 512 (c) or (e), 40 P.S. § 1303.512?

Appellants' Brief at 4-5.

In his first three issues, Appellant argues that Dr. Rinder was not qualified to testify regarding Appellee's standard of care under the MCARE Act. Specifically, Appellant asserts that Appellee failed to establish that Dr. Rinder was qualified under either Section 512(c) or 512(e) of the MCARE Act because both sections ultimately require that an expert "[b]e substantially familiar with the applicable standard of care for the specific care at issue as of the time of the alleged breach of the standard of care." 40 P.S. § 1303.512(c)(1).

Appellant avers that as a hematologist, Dr. Rinder was not sufficiently familiar with the standard of care for an interventional cardiologist like Appellee. Appellant points to the particular testimony offered by Dr. Rinder regarding whether Appellee appropriately ensured that Decedent was properly therapeutically anticoagulated at the start of the PCI procedure. Appellant asserts Dr. Rinder demonstrated that he was unfamiliar with Appellee's standard of care by declining to testify regarding the potential for clotting as the result of specific actions during the PCI procedure and by

refusing to opine that an ACT test was necessary prior to the PCI procedure.

We cannot agree.

As a prefatory matter, we note:

> "[w]hether a witness has been properly qualified to give expert witness testimony is vested in the discretion of the trial court. It is well settled in Pennsylvania that the standard for qualification of an expert witness is a liberal one." ***Wexler v. Hecht***, 847 A.2d 95, 98 (Pa. Super. 2004) (citations and quotation marks omitted). "Thus, we may reverse the trial court's decision regarding admission of expert testimony only if we find an abuse of discretion or error of law. Furthermore, because the issue regarding an expert's qualifications under the MCARE Act involves statutory interpretation, our review is plenary." ***Jacobs v. Chatwani,*** 922 A.2d 950, 956 (Pa. Super. 2007) (citations omitted).

***Vicari v. Spiegel***, 936 A.2d 503, 512-13 (Pa. Super. 2007) ("Vicari I").

The MCARE Act provision addressing the qualification of expert witnesses provides, in pertinent part:

### § 1303.512. Expert qualifications

**(a) General rule.**—No person shall be competent to offer an expert medical opinion in a medical professional liability action against a physician unless that person possesses sufficient education, training, knowledge and experience to provide credible, competent testimony and fulfills the additional qualifications set forth in this section as applicable.

**(b) Medical testimony.**—An expert testifying on a medical matter, including the standard of care, risks and alternatives, causation and the nature and extent of the injury, must meet the following qualifications:

(1) Possess an unrestricted physician's license to practice medicine in any state or the District of Columbia.

- 10 -

(2) Be engaged in or retired within the previous five years from active clinical practice or teaching.

Provided, however, the court may waive the requirements of this subsection for an expert on a matter other than the standard of care if the court determines that the expert is otherwise competent to testify about medical or scientific issues by virtue of education, training or experience.

**(c) Standard of care.—**In addition to the requirements set forth in subsections (a) and (b), an expert testifying as to a physician's standard of care also must meet the following qualifications:

(1) Be substantially familiar with the applicable standard of care for the specific care at issue as of the time of the alleged breach of the standard of care.

(2) Practice in the same subspecialty as the defendant physician or in a subspecialty which has a substantially similar standard of care for the specific care at issue, except as provided in subsection . . . (e).

(3) In the event the defendant physician is certified by an approved board, be board certified by the same or a similar approved board, except as provided in subsection (e).

\* \* \*

**(e) Otherwise adequate training, experience and knowledge.—**A court may waive the same specialty and board certification requirements for an expert testifying as to a standard of care if the court determines that the expert possesses sufficient training, experience and knowledge to provide the testimony as a result of active involvement in or full-time teaching of medicine in the applicable subspecialty or a related field of medicine within the previous five-year time period.

40 P.S. § 1303.512(a)-(c), (e).

"With passage of the MCARE Act, the General Assembly created a more stringent standard for admissibility of medical expert testimony in a medical malpractice action by the imposition of specific additional requirements not present in the common law standard." ***Vicari v. Spiegel***, 989 A.2d 1277, 1280 (Pa. 2010) ("Vicari II"). Our Supreme Court has summarized these "additional requirements" as follows:

> [P]ursuant to Section 512, to testify on a medical matter in a medical malpractice action against a defendant physician, an expert witness must be a licensed and active, or a recently retired, physician. In addition, in order to render an opinion as to the applicable standard of care, the expert witness must be substantially familiar with the standard of care for the specific care in question. Furthermore, the expert witness must practice in the same subspecialty as the defendant physician, or in a subspecialty with a substantially similar standard of care for the specific care at issue ("same specialty requirement"). Finally, if the defendant physician is board certified, the expert witness must be board certified by the same or a similar board ("same board certification requirement"). Importantly, the expert witness must meet all of these statutory requirements in order to be competent to testify. However, there is an exception to the same specialty and same board-certification requirements: if a court finds that an expert witness has sufficient training, experience, and knowledge to testify as to the applicable standard of care, as a result of active involvement in the defendant physician's subspecialty or in a related field of medicine, then the court may waive the same specialty and same board certification requirements.

***Id.*** at 1281 (emphasis omitted). The burden to establish an expert's qualifications under the MCARE Act lies with the proponent of the expert testimony. ***Weiner v. Fisher***, 871 A.2d 1283, 1290 (Pa. Super. 2005).

Significantly, Pennsylvania courts have consistently held that medical specialties may overlap and an expert can qualify to testify under the MCARE Act upon demonstrating a familiarity with the specific standard of care at issue. *See Vicari II*, 989 A.2d at 1281-84 (holding oncologist was qualified to testify regarding standard of care for otolaryngologist and radiation oncologist where oncologist demonstrated sufficient training and experience gained through thirty years of practice in a related field); *Hyrcza v. West Penn Allegheny Health Sys., Inc.*, 978 A.2d 961, 973-74 (Pa. Super. 2009) (holding physician who was psychiatrist and neurologist was qualified to testify regarding standard of care for physiatrist's treatment of multiple sclerosis patient where testifying physician could demonstrate that a substantial portion of his practice was devoted to such care); *Smith v. Paoli Memorial Hosp.*, 885 A.2d 1012, 1016-18 (Pa. Super. 2005) (holding general surgeon, oncologist, and internist were permitted to testify against gastroenterologist, where each testifying physician could report having experience treating gastrointestinal bleeding and cancers).

In the instant case, the trial court found that Dr. Rinder demonstrated sufficient familiarity with Appellee's standard of care to permit him to testify under Sections 512(c)(1) and 512(e) of the MCARE Act and we agree. The crux of Appellant's argument lies in his contention that as a hematologist who did not personally perform PCI procedures, Dr. Rinder was not qualified to testify as both Section 512(c)(1) and 512(e) require a "substantial

familiarity" with the care involved. However, a review of Dr. Rinder's qualifications and his specific testimony reveal that he was eminently qualified.

Dr. Rinder specifically limited his testimony to the standard of care necessary to the administration of anticoagulation medication prior to a PCI procedure. He explained that in the course of his practice, he often consulted with interventional cardiologists regarding this exact subject. N.T., 1/21/15, at 15-16. Dr. Rinder's particular expertise in the area of clotting, coagulation, bleeding, and thrombosis, as well as his experience consulting on the proper dosages to be administered prior to PCI procedures, allowed him to opine that the 5000 units of Heparin given to Decedent prior to his PCI procedure comported with the standard of care. *See Vicari II*, 989 A.2d at 1281; *Hyrcza*, 978 A.2d at 973-74; *Smith*, 885 A.2d at 1018.

Dr. Rinder's refusal to opine on other areas outside of the correct dosages of anticoagulation medication did not render him unqualified to testify regarding his area of expertise. Therefore, we conclude that the trial court did not err by concluding that Dr. Rinder was sufficiently familiar with Appellee's standard of care regarding the correct dosages of anticoagulation drugs prior to a PCI procedure and thereby properly admitted Dr. Rinder's expert testimony. *Vicari II*, 989 A.2d at 1281. Accordingly, Appellant's first three issues lack merit.

In his final issue, Appellant assets that the trial court also erred by finding that a new trial was not warranted because Dr. Rinder's testimony was not sufficiently prejudicial to Appellant's case. Specifically, Appellant avers that Dr. Rinder's testimony regarding the standard of care and the necessity of an ACT test was particularly harmful because this testimony contradicted that of Appellee's own expert, Dr. Kahn. However, a review of the record reveals that Appellant's contention is not accurate.

When reviewing a trial court's ruling regarding a new trial, we note:

> [I]f the basis of the request for a new trial is the trial court's rulings on evidence, then such rulings must be shown to have been not only erroneous but also harmful . . . . Evidentiary rulings which did not affect the verdict will not provide a basis for disturbing the jury's judgment.

*Detterline v. D'Ambrosio's Dodge*, *Inc.*, 763 A.2d 935, 938 (Pa. Super. 2000) (citation omitted); *see Hyrcza*, 978 A.2d at 974 (holding any error in the admission of expert testimony regarding the standard of care was harmless where another qualified expert testified to the same standard of care at trial).

In the instant case, the trial court concluded that any error in the admission of Dr. Rinder's testimony was harmless because Dr. Kahn, an interventional cardiologist, also opined that Appellee did not breach the standard of care in his administration of anticoagulant medication prior to Decedent's PCI procedure. Our review of the record reveals no reason to disturb the trial court's finding of harmless error. Dr. Kahn specifically noted

- 15 -

that Appellee comported with the standard of care when administering 5,000 units of Heparin prior to Decedent's PCI procedure. N.T., 1/20/15, at 38. Dr. Kahn even went a step further, opining that Appellee did not breach the standard of care by failing to conduct an ACT test. *Id.* Accordingly, because Dr. Kahn testified to the same standard of care as Dr. Rinder, we conclude that any error in admitting Dr. Rinder's testimony was indeed harmless. *See Hyrcza*, 978 A.2d at 974. Therefore, having discerned no abuse of discretion or error of law, we affirm the judgment below.

Judgment affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/26/2016