J-A24032-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| PEARL KERSEY, INDIVIDUALLY AND AS ADMINISTRATRIX OF THE ESTATE OF LONNIE KERSEY, DECEASED | : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | : : : | |
| MICHAEL J. PISANO, III, D.O., AND PASSYUNK MEDICAL ASSOCIATES, P.C. | : : : : : | No. 798 EDA 2022 |
| Appellants | : : | |

Appeal from the Judgment Entered March 2, 2022
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s): 1804-04705

BEFORE: PANELLA, P.J., BENDER, P.J.E., and SULLIVAN, J.

MEMORANDUM BY SULLIVAN, J.: **FILED MARCH 7, 2023**

Michael J. Pisano, III, D.O. ("Dr. Pisano"), and Passyunk Medical Associates, P.C. (collectively "Appellants"), appeal from the entry of judgment in favor of Pearl Kersey, individually and as Administratrix of the Estate of Lonnie Kersey, deceased ("Appellee"). We vacate the order entering judgment, affirm in part and vacate in part the jury's verdict, and remand with instructions.

The relevant factual and procedural history is as follows. In 2010, Lonnie Kersey ("Decedent") sought medical care from Dr. Pisano, a board-certified specialist in internal medicine practicing as a primary care physician. At the inception of their patient-physician relationship, Decedent informed Dr.

Pisano that Decedent's father died from prostate cancer. Decedent also informed Dr. Pisano that Decedent suffered from benign prostate hyperplasia (enlarged prostate) which he treated with dutasteride, a medication that increases the risk of high-grade prostate cancer and artificially suppresses prostate specific antigen ("PSA") levels by fifty percent.[1] Decedent additionally informed Dr. Pisano that he was the victim of a gunshot wound prior to 1992 and, in connection therewith, underwent a blood transfusion.[2] Finally, Decedent informed Dr. Pisano that his lab tests showed elevated liver enzymes.

In 2012, Dr. Pisano ordered bloodwork for Decedent which revealed that his PSA level was 1.0 ng/ml. In March of 2014, Dr. Pisano ordered further testing which revealed that Decedent's PSA level was 1.2 ng/ml. In May 2014, while Decedent was receiving in-patient treatment at Thomas Jefferson University Hospital,[3] a blood test revealed that Decedent had hepatitis C. There is no evidence that Decedent informed Dr. Pisano of this diagnosis, nor any evidence that Dr. Pisano reviewed the hospital records.

_____

[1] PSA is a protein in blood that is used to screen for prostate cancer.

[2] Appellee maintains that the fact that Decedent had a blood transfusion prior to 1992 is significant because, before 1992, there was no procedure in place to test donated blood for diseases, such as hepatitis C. **See** Appellee's Brief at 5.

[3] Decedent underwent an amputation of his distal left leg due to peripheral vascular disease.

Testing performed in September of 2015 revealed that Decedent's PSA level had increased to 3.0 ng/ml, which should have been regarded as in the abnormal range due to the fact that Decedent was taking dutasteride. There is no documentation that Dr. Pisano understood the clinical significance of the abnormal PSA test result or that he discussed it with Decedent. Over the course of the next two years, Dr. Pisano did not order any follow-up PSA testing for Decedent. On February 8, 2017, another blood test indicated that Decedent had hepatitis C. On September 6, 2017, testing revealed that Decedent's PSA level had increased to 203.3 ng/ml. Decedent's last appointment with Dr. Pisano was on September 11, 2017. At that appointment, Dr. Pisano referred Decedent to a specialist for treatment of suspected prostate cancer.[4] On September 27, 2017, Decedent was diagnosed with metastatic stage IV prostate cancer.

Decedent and Appellee commenced the instant litigation in April 2018 by filing a writ of summons. They filed a complaint on June 2018 asserting claims sounding in medical malpractice based on Appellants' care and treatment of Decedent between 2015 and 2017. On July 5, 2018, Decedent was diagnosed with liver cancer caused by chronic untreated hepatitis C and

---

[4] Between 2010 and 2017, Decedent had over seventy medical appointments with Dr. Pisano.

cirrhosis. Decedent died on July 31, 2018 due to liver failure.[5] His death certificate, which was issued one week later, listed liver cancer as the sole cause of death. *See* Certificate of Death, 8/6/18, at 1.

In August 2018, the trial court entered a case management order which established, *inter alia*, a deadline for expert reports on December 2, 2019. By stipulation, the parties extended the expert report deadline to January 16, 2020.

On January 28, 2019, Appellee filed a first amended complaint. Therein, Appellee averred that Dr. Pisano deviated from the accepted standard of care when he failed to refer Decedent to a urologist for assessment of possible prostate cancer following the abnormal September 2015 PSA test, and failed to order any further PSA testing between 2015 and 2017. *See* First Amended Complaint, 1/28/19, at ¶¶ 40-44. Appellee claimed that, as a result of Appellants' negligence, "[Decedent's] prostate cancer was allowed to progress, undiagnosed and untreated to advanced, metastatic [s]tage IV disease with a corresponding diminution of his life expectancy." *Id*. at ¶ 52. Further, the first amended complaint averred that "[t]he negligence of Defendants, by their acts and/or omissions resulted in an unreasonable delay in the diagnosis of [Decedent's] prostate cancer" and that he "passed away as a result of his advanced stage cancer." *Id*. at ¶¶ 53, 57. The first amended

---

[5] Following Decedent's death, Appellee was substituted as plaintiff in her individual capacity and as the administratrix of his estate.

complaint asserted a wrongful death claim pursuant to 42 Pa.C.S.A. § 8301, and a survival act claim pursuant to 42 Pa.C.S.A. § 8301, and attached a copy of Decedent's death certificate. The first amended complaint made no mention of Decedent's liver cancer; nor did it contain any allegations of medical negligence specifically related to the care and treatment of Decedent's liver, the failure to test for hepatitis C, or the failure to refer Decedent to a hepatologist. The first amended complaint also did not contain any assertions of medical negligence by Dr. Pisano prior to 2015. Appellants did not file preliminary objections to the first amended complaint.

In August 2020, Appellee produced the expert reports of David L. Fried, M.D., and Guarionex Joel DeCastro, M.D. In his August 15, 2020 report, Dr. Fried, a board-certified specialist in internal medicine and adult primary care, opined that Dr. Pisano deviated from the standard of care for internists when he failed to recognize the clinical significance of Decedent's abnormal PSA level in September 2015 and refer him to a specialist for treatment at that time, and in the two years thereafter, resulting in the development of metastatic stage IV prostate cancer. *See* Fried Expert Report, 8/15/20, at 6.

In his August 27, 2020 report, Dr. DeCastro, a board-certified urologist with an area of focus in prostate cancer, opined that Dr. Pisano deviated from the applicable standard of care when he failed to recognize the clinical significance of Decedent's abnormal PSA level in September 2015 and refer him to a urologist for biopsy and treatment. *See* DeCastro Expert Report,

8/27/20, at 3. Dr. DeCastro further opined that, had Dr. Pisano referred Decedent to a specialist in September 2015 after the initial tripling of his PSA levels, his prostate cancer would not have spread beyond the prostate and he would have had a ninety percent chance of cure. *Id*.

On January 5, 2021, Appellee produced the supplemental expert report of Dr. DeCastro in which he opined that, although Decedent died of liver failure caused by liver cancer, "the underlying widespread metastatic prostate cancer was a substantial contributing factor to his death." DeCastro Expert Report, 1/5/21, at 1. In Dr. DeCastro's opinion, Dr. Pisano's failure to refer Decedent to a specialist in September 2015 resulted in the delay of the diagnosis and treatment of Decedent's prostate cancer, which meant that his hepatitis C could not be treated due to the need for systemic chemotherapy for the prostate cancer, thereby increasing the risk that he would develop liver cancer from hepatitis C. *Id*.

The case was originally scheduled to be ready for trial in May 2020. However, due to the Covid-19 pandemic and the resultant court closures, trials were suspended until March 4, 2021. As a result, the case was rescheduled for trial in October 2021.

On July 6, 2021, Appellee produced the expert report of George Y. Wu, M.D., a board-certified internist with specialties in gastroenterology and hepatology. In his July 6, 2021 report, Dr. Wu opined that Dr. Pisano was negligent in his care and treatment of Decedent's liver between 2010 and

2014. Specifically, Dr. Wu opined that Dr. Pisano deviated from the standard of care when he failed to order hepatitis C screenings for Decedent beginning in 2010, given Decedent's numerous risk factors (*i.e.*, a blood transfusion prior to 1992, elevated liver enzymes, and advanced age). *See* Wu Expert Report, 7/6/21, at 2. Dr. Wu further opined that Dr. Pisano's delay until 2017 in referring Decedent to a specialist meant that treatment for Decedent's hepatitis C was delayed. *Id*. at 3. The parties scheduled Dr. Wu's trial deposition for September 15, 2021. The day before Dr. Wu's trial deposition, Appellee submitted two supplemental expert reports prepared by Dr. Wu. In one report, Dr. Wu clarified his opinion that Dr. Pisano was negligent in the care and treatment of Decedent's liver commencing in 2010 when he failed to regularly screen Decedent for hepatitis C. *See* Wu Expert Report, 9/14/21, at 1. In another report, Dr. Wu noted that, on May 15, 2014, Decedent was diagnosed with hepatitis C while hospitalized at Thomas Jefferson University Hospital. *See* Wu Expert Report, 9/14/21, at 1. Dr. Wu further concluded that, although there is no evidence that Decedent communicated to Dr. Pisano that he had been diagnosed with hepatitis C, Dr. Pisano deviated from the standard of care by failing to review the hospital records to learn of the hepatitis C diagnosis, inform Decedent of the significance of that diagnosis, and insist that Decedent see a hepatologist in 2014. *Id*. at 2.

Appellants filed motions *in limine* to preclude: (1) any cause of action for liability related to Decedent's liver cancer as barred by the statute of

limitations; (2) Dr. Wu's expert reports and testimony as untimely; and (3) the testimony of Drs. Wu and DeCastro as unqualified to provide testimony on the standard of care applicable to an internist or primary care physician. Appellee sought to prevent the admission of any evidence regarding Decedent's non-compliance with two referrals provided to him in 2008 to see a urologist due to his benign prostate hyperplasia (enlarged prostate). The trial court granted Appellee's motion *in limine* and denied Appellants' motions *in limine*.

The matter proceeded to jury trial in October 2021. Appellee presented the expert testimony of Drs. DeCastro and Fried, and the trial deposition testimony of Dr. Wu. Dr. DeCastro testified that Dr. Pisano deviated from the standard of care when he inappropriately managed Decedent's abnormal PSA test result in September 2015, an almost tripling of his prior PSA test, and failed to discuss the test results with Decedent. ***See*** N.T., 10/19/21, at 93-94, 95. Dr. DeCastro pointed out that Decedent had several risk factors for developing prostate cancer, including being an African American male (and thus a member of a demographic that tend to get worse prostate cancer at an earlier age and fare worse) with a family history of prostate cancer, all of which drastically heightened his risk of harboring prostate cancer. ***Id***. at 95, 119. Dr. DeCastro also testified that, because Decedent was taking dutasteride for his benign prostate hyperplasia (enlarged prostate), Dr. Pisano should have interpreted Decedent's September 2015 PSA test result of 3.0

ng/ml as 6.0 ng/ml because "it is a very well-established and known fact" that dutasteride artificially shrinks the prostate and the PSA levels. *Id*. at 103; *see also id*. at 118 (wherein Dr. DeCastro opined that "anybody who prescribes [dutasteride] must know that [the PSA is not 3, it's 6]. And if they don't, they shouldn't be prescribing [dutasteride]"). Dr. DeCastro further explained that, if an individual taking dutasteride develops prostate cancer, it tends to be a more aggressive prostate cancer. *Id*. at 104. Dr. DeCastro opined that, in September 2015 Decedent had likely developed localized prostate cancer which, if treated, would not have spread beyond the prostate would have had a ninety percent chance of cure. *Id*. at 122-27.

Dr. Fried testified that Dr. Pisano deviated from the standard of care when he failed to perform a digital rectal exam of Decedent's prostate at any medical appointment after Decedent's initial visit in 2010. *See* N.T., 10/20/21, at 22-23. Like Dr. DeCastro, Dr. Fried explained that it is well-documented that dutasteride artificially shrinks the prostate and lowers the PSA levels by fifty percent. *Id*. at 19. Dr. Fried testified that there is no indication in the medical records that Dr. Pisano recognized the clinical significance of Decedent's September 2015 PSA test results, or that they were abnormal. *Id*. at 23. Dr. Fried explained that Dr. Pisano should have interpreted Decedent's March 2014 PSA test result of 1.2 ng/ml as 2.4 ng/ml, and his September 2015 PSA test result of 3.0 ng/ml as 6.0 ng/ml, which was above the normal range of 0 ng/ml to 4.0 ng/ml. *Id*. at 24. Dr. Fried further

explained that Decedent had several risk factors for prostate cancer, including an enlarged prostate, his age over fifty, being of African American descent, and having a first-degree family member (father) who had prostate cancer. *Id*. Dr. Fried opined that these risk factors, coupled with the short timeframe in which Decedent's PSA levels nearly tripled between 2014 and 2015, should have been very suspicious, concerning, and regarded as a "red flag [that] this is cancer until proven otherwise." *Id*. at 24-25. Dr. Fried explained that, when a primary care physician sees a lab value like Decedent's September 2015 PSA level, the physician is obligated to discuss the test result with the patient and refer the patient to a urologist. *Id*. at 25. Dr. Fried concluded that Dr. Pisano deviated from the standard of care of a primary care physician by failing to recognize that Decedent's September 2015 PSA test result was "very abnormal," failing to have a discussion with him regarding his abnormal test result, and failing to refer him to a urologist for diagnostic testing and treatment. *Id*. at 25-26, 34-35. Dr. Fried further concluded that Dr. Pisano deviated from the standard of care by failing to order any further screening or diagnostic testing of Decedent's PSA level at any subsequent medical appointment until September 2017, when his prostate cancer had already metastasized. *Id*. at 25-26, 86.

In his trial deposition, Dr. Wu testified that Dr. Pisano deviated from the standard of care when he failed to screen Decedent for hepatitis C between 2010 and 2014, given Decedent's age, the fact that he had a blood transfusion

prior to 1992, and that fact that his test results indicated elevated liver enzymes. *See* N.T., 9/15/21, at 98-99. Dr. Wu explained that, because there was no commercially available screening test for hepatitis C until 1992, individuals who received blood transfusions before 1992 are at the highest risk for that disease. *Id*. at 47. Dr. Wu further testified that Dr. Pisano should have reviewed Decedent's May 2014 hospital records which indicated that he tested positive for hepatitis C. *Id*. at 119-27. Dr Wu indicated that if Decedent's hepatitis C had been treated, it would have prevented Decedent from developing cirrhosis and liver cancer as a result of his hepatitis C. *Id*. at 177.

The trial court instructed the jury to make separate findings of fact as to liability, causation, and damages for both Decedent's prostate cancer and his liver cancer. At the conclusion of trial, the jury returned a verdict in favor of Appellee. Pursuant to a special verdict form, the jury determined that Dr. Pisano was negligent in his treatment of Decedent's prostate health and in his treatment of Decedent's liver health, and awarded compensatory damages in the amount of $1,500,000 for the prostate cancer and $1,200,000 for the liver cancer.[6] Appellants filed a post-verdict motion asserting that the liver cancer cause of action was barred by the statute of limitations and seeking a new

_____

[6] The jury determined that Decedent was twenty percent liable for his liver cancer because he failed to get bloodwork the first time Dr. Pisano instructed him to do so.

- 11 -

trial solely on the prostate cancer cause of action. Appellee filed a motion to award delay damages. In orders entered on February 25, 2022, the trial court denied Appellants' post-trial motion and granted Appellee's motion for delay damages. On March 2, 2022, the trial court entered judgment for Appellee in the amount of $3,058,099.76. Appellants filed a timely notice of appeal and both Appellants and the trial court complied with Pa.R.A.P. 1925.

Appellants raise the following issues for our review:

1. Should questions about screening for liver disease and its treatment have been submitted to the jury, and evidence in support of this cause of action admitted at trial, when no references to liver screening, treatment, or diseases appear in any of [Appellee's] complaints or other pleadings, and when this cause of action was first advanced by the production of the report of expert witness Dr. . . . Wu on July 6, 2021, a year after the statute of limitations ran on July 31, 2020?

2. Should [Appellee] have been allowed to offer into evidence the opinions, by written reports and sworn testimony, of [Dr. Wu], when [he] was first identified as a witness and his opinions were first advanced by [Appellee] on July 6, 2021, nineteen months after the applicable deadline under the case management order, and [Appellee] advanced further new theories of liability by way of new reports by Dr. Wu produced on September 14, 2021?

3. Should [Appellee] have been allowed to offer into evidence the opinions of expert witness [Dr.] Wu, who does not practice internal medicine and has never been a primary care physician, as to the standard of care applicable to Dr. Pisano, a primary care physician board certified in internal medicine?

4. Should [Appellee] have been allowed to offer into evidence the opinions of expert witness [Dr.] DeCastro, who does not practice internal medicine and has never been a primary care physician, as to the standard of care applicable to Dr. Pisano, a primary care physician board certified in internal medicine, despite the provisions of 40 P.S. § 1303.512?

- 12 -

5. Should [Appellants] have been barred from presenting at trial evidence that [Decedent] was causally noncompliant with referrals to urology specialists for prostate treatment, when such evidence was relevant and thus admissible under Pa.R.E. 402, it was nonprejudicial as a matter of law, and [Appellee] presented no cognizable argument for its preclusion?

Appellants' Brief at 3-5 (unnecessary capitalization omitted).

In their first issue, Appellants claim that the trial court should not have permitted the case to proceed on the liver cancer cause of action because it was not raised in the complaint, the first amended complaint, or at any time in the case until after the statutes of limitation expired. We begin with a review of the applicable law. Absent issues pertaining to the discovery rule, the determination of which statute of limitations applies and whether it has run on a particular claim are generally questions of law for the trial judge. *See Wilson v. Transp. Ins. Co.*, 889 A.2d 563, 570 (Pa. Super. 2005). These questions of law compel this Court's plenary review to determine whether the trial court committed an error of law. *Id*.

In Pennsylvania, the statute of limitations applicable to medical negligence, wrongful death, and survival actions appears at 42 Pa.C.S.A. § 5524 (2), which provides that "an action to recover damages for injuries to the person or for the death of an individual caused by the wrongful act or neglect or unlawful violence or negligence of another" must be commenced

within two years.[7] The two-year period begins to run "from the time the cause of action accrued . . ." 42 Pa.C.S.A. § 5502 (a).

The causes of action for these various claims accrue at different times. The statute of limitations for a medical negligence cause of action typically begins to run from the time of injury. *See Ayers v. Morgan*, 289-90, 154 A.2d 788, 792 (Pa. 1959) (explaining that a right of action accrues only when injury is sustained by the plaintiff, not when the causes are set in motion which ultimately produce injury as a consequence); *see also Ingenito v. AC & S, Inc.*, 633 A.2d 1172, 1174 (Pa. Super. 1993) (explaining that, in creeping diseases cases, the statute of limitations begins to run when the injured person knows, or reasonably should know: (1) that he has been injured; and (2) that his injury has been caused by another party's conduct). Similarly, the statute of limitations for a survival action begins to run on the date of the decedent's injury, as if the decedent were bringing his or her own lawsuit. *See Moyer v. Rubright*, 651 A.2d 1139, 1141-42 (Pa. Super. 1994) (holding that the statute of limitations on a cause of action under the survival act for medical negligence for failure to detect cancer began to run on the date plaintiff was diagnosed with cancer); *see also Salvadia v. Ashbrook*, 923

---

[7] The Medical Care Availability and Reduction of Error Act ("MCARE") provides a statute of limitations that requires a claimant to commence a wrongful death or a survival action asserting a medical professional liability claim within two years after the date of death in the absence of affirmative misrepresentation or fraudulent concealment of the cause of death. *See* 40 P.S. § 1303.513(d).

A.2d 436, 440, (Pa. Super. 2007) (explaining that, unlike a wrongful death action, a survival action is not a new cause of action, but merely continues in the decedent's personal representative the right of action which accrued to the deceased at common law).  On the other hand, the statute of limitations for a wrongful death claim begins to run when a pecuniary loss is sustained by the beneficiaries of the person whose death has been caused by the tort of another, but no later than the date of the decedent's death.  **Moyer**, 651 A.2d at 1142.  The purpose of a statute of limitations period is to expedite litigation and discourage delay and the presentation of stale claims which may greatly prejudice the defense of such claims.  **See Wachovia Bank, N.A. v. Ferretti**, 935 A.2d 565, 575 (Pa. Super. 2007) (holding that statutes of limitation are to be strictly construed).

The purpose of pleadings is to place the defendants on notice of the claims upon which they will have to defend.  **See Carlson v. Cmty. Ambulance Servs.**, 824 A.2d 1228, 1232 (Pa. Super. 2003).  Accordingly, a complaint must give the defendants fair notice of the plaintiff's claims and a summary of the material facts that support those claims.  **Id**.  The Pennsylvania Rules of Civil Procedure provide that a plaintiff may state in the complaint more than one cause of action against the same defendant; however, "[e]ach cause of action and any special damage related thereto shall be stated in a separate count containing a demand for relief."  Pa.R.C.P. 1020(a).

Pursuant to Rule 1033, a party may at any time, either with consent of the adverse party or with leave of court, amend his or her pleading to aver transactions or occurrences which happened before or after the filing of the original pleading, even though they give rise to a new cause of action. *See* Pa.R.C.P. 1033(a). A party may also seek such an amendment to conform the pleading to the evidence offered or admitted. *Id*. Such amendments are to be liberally permitted except where surprise or prejudice to the other party will result, or where the amendment is against a positive rule of law. *See Berman v. Herrick*, 227 A.2d 840, 841 (Pa. 1967). Amendments that would introduce a new cause of action are not permitted after the applicable statute of limitations has run. *See Olson v. Grutza*, 631 A.2d 191, 198 (Pa. Super. 1993).

A claim or cause of action in negligence has been defined as the negligent act or acts which occasioned the injury for which relief is sought. *See Reynolds v. Thomas Jefferson Univ. Hosp.*, 676 A.2d 1205, 1210 (Pa. Super. 1996). A new cause of action does not exist if a plaintiff's amendment merely adds to or amplifies the original complaint or if the original complaint states a cause of action showing that the plaintiff has a legal right to recover what is claimed in the subsequent complaint. *Id*. at 1210; *see also Connor v. Allegheny Gen. Hosp.*, 461 A.2d 600 (Pa. 1983) (holding that, where plaintiffs in their original complaint made specific allegations of negligence as well as a general allegation that defendant hospital was negligent "[i]n

otherwise failing to use due care and caution under the circumstances," the trial court erred in denying plaintiffs' motion to amend the complaint to specify other ways in which the hospital was negligent).  For purposes of determining whether a claimed or apparent discrepancy between pleadings and proof constitutes a variance, the entire pleadings and evidence should be considered.  *See Reynolds*, 676 A.2d at 1209.  Pennsylvania courts have held that a variance is not material if the alleged discrepancy causes no prejudice to the adverse party.  *Id*.

However, a new cause of action arises if the plaintiff proposes a different theory or a different kind of negligence than the one previously raised or if the operative facts supporting the claim are changed.  *Id*. at 1213.  Stated differently, a variance occurs where the proof at trial establishes a cause of action that was not alleged in the parties' pleadings.  *Id*. at 1209.  Where an expert report sets forth a new cause of action, the trial court may not permit the plaintiff to introduce the report after the applicable statute of limitations has run.  *Id*. at 1210.

Appellants contend that the complaint and first amended complaint pertain solely to Dr. Pisano's clinical judgment in monitoring Decedent's prostate health and risk for prostate cancer between 2015 and 2017. According to Appellants, the first amended complaint contains one-hundred and forty-six references to the prostate or to urological symptoms or treatment, but contains no reference to Decedent's liver, liver health, liver

diseases, or liver cancer. Appellants contend that the first amended complaint also failed to give notice of any claim pertaining to Dr. Pisano's treatment of Decedent between 2010 and 2014. Appellants maintain that Dr. Wu's expert reports presented a new and distinct cause of action for Dr. Pisano's treatment of Decedent's liver between 2010 and 2014, to which different courses of treatment would be prescribed, different defenses would apply, different evidence would be required for proof, and different damages would attach upon a finding of liability. As further support for their argument that the causes of action were distinct, Appellants point to the fact that the trial court instructed the jury to make separate findings on liability and damages arising from a cause of action related to Decedent's prostate cancer diagnosis in 2017 and a cause of action related to Decedent's liver cancer diagnosis in 2018.

Appellants point out that the two-year statute of limitations for injuries and death suffered by Decedent due to medical negligence expired, at the latest, on July 31, 2020, which is two years after Decedent's death. Appellants assert that Appellee did not raise any theory of liability regarding Dr. Pisano's treatment of Decedent's liver until nearly one year after the statute of limitations expired, when Appellee produced the July 6, 2021 expert report of Dr. Wu. Appellee thereafter produced supplemental expert reports prepared by Dr. Wu in which he rendered opinions regarding Dr. Pisano's management of Decedent's liver health between 2010 and 2014. Appellants assert that Dr. Wu's deposition testimony was the only evidence presented to the jury

regarding Dr. Pisano's liability for managing Decedent's liver health. Appellants claim that Appellee's liver-related claims are barred by the statute of limitations as a matter of law, and that the trial court erred by permitting plaintiffs to proceed on that cause of action.

The trial court considered Appellants' first issue and summarily concluded that there was no material variance between the pleadings and the evidence Appellee sought to admit at trial. **See** Trial Court Opinion, 6/13/22, at 6-7. We cannot agree with the trial court's unsupported conclusion.

As explained above, the operative complaint must give the defendants fair notice of the plaintiff's claims and a summary of the material facts that support those claims. **See Carlson**, 824 A.2d at 1232. Further, if a plaintiff alleges more than one cause of action against the same defendant, each cause of action and any special damage related thereto must be stated in a separate count containing a demand for relief. **See** Pa.R.C.P. 1020(a).

In the instant matter, the first amended complaint contained only one cause of action (Count I) against Dr. Pisano which pertained solely to his failure to apprehend the clinical significance of Decedent's abnormal PSA test result in September of 2015, and his failure to conduct further PSA testing between September of 2015 and September 2017. **See** First Amended Complaint, 1/28/19, at ¶¶ 62-65. The first amended complaint asserted a prayer for relief for Count I in excess of $50,000. **Id**. at 16. Appellee asserted a separate cause of action (Count II) against Passyunk Medical Associates,

P.C., and the "Jefferson Defendants," which included Thomas Jefferson University Hospital and its related entities.[8] *See id*. at 16-17, ¶¶ 66-69. As in Count I, Count II consisted of averments regarding the failure by the various defendant entities and their agents to appreciate the clinical significance of Decedent's September 2015 abnormal PSA test result, conduct follow-up testing, and refer Decedent to a urologist. *See id*. The first amended complaint asserted a prayer for relief for Count II in excess of $50,000. *Id*. at 18. The first amended complaint did not include any averments or prayer for relief against either Dr. Pisano or Passyunk Medical Associates, P.C., pertaining to Dr. Pisano's failures to test Decedent for hepatitis C between 2010 and 2014, obtain Decedent's hospital records from May 2014, discuss the hepatitis C diagnosis with Decedent, or refer Decedent to a hepatologist in 2014.

As Decedent was diagnosed with liver cancer on July 5, 2018, the statute of limitations applicable to a survival claim based on Decedent's liver cancer would have expired on July 5, 2020. Similarly, because Decedent died on July 31, 2018, the statute of limitations applicable to a wrongful death claim based on Decedent's liver cancer would have expired, at the latest, on July 31, 2020. At no point prior to those statutory expiration dates did Appellee seek to

---

[8] The Jefferson Defendants filed a motion for summary judgment which was uncontested by Appellee. The trial court granted the motion, and the Jefferson Defendants were dismissed from the action in January 2021.

amend her first amended complaint to add: a new cause of action based on Dr. Pisano's negligence with respect to Decedent's liver health between 2010 and 2014; a summary of the material facts supporting such a claim; or a prayer for relief pertaining to Decedent's diagnosis of and death from liver cancer.

Instead, after the statutes of limitation pertaining to Decedent's liver cancer had expired, Appellee produced the expert reports of Dr. Wu. In his July 6, 2021 and September 14, 2021 reports, Dr. Wu opined that Dr. Pisano was negligent in the care and treatment of Decedent's liver and liver health. Specifically, Dr. Wu concluded that, given Decedent's various risk factors, including a blood transfusion from a gunshot wound prior to 1992, elevated liver enzymes, and his age, Dr. Pisano should have been screening Decedent for hepatitis C from the inception of their patient-physician relationship in 2010. *See* Wu Expert Report, 7/6/21, at 3. Dr. Wu further concluded that, after Decedent was diagnosed with hepatitis C in May 2014 while he was admitted at Thomas Jefferson University Hospital, Dr. Pisano was careless in failing to review Decedent's hospital records and learn of the test results, inform Decedent of his hepatitis C diagnosis and its significance, and insist that Decedent see a hepatologist in 2014. *See* Wu Expert Report, 9/14/21, at 2.

Even the most generous reading of the rule permitting liberal allowance of amendments would not countenance the introduction of a new theory of

liability sought so late by Appellee. These new claims of medical negligence, as set forth in Dr. Wu's expert reports, did not merely add to or amplify the negligence claims set for in the first amended complaint which focused exclusively on Dr. Pisano's failure to appreciate the clinical significance of Decedent's abnormal September 2015 PSA test, to refer him to a urologist at that time, and to order further prostate testing between 2015 and 2017. *See* Amended Complaint, 1/28/19, at ¶¶ 40-44, 63-65. The proof needed to establish the theory of negligence espoused by Dr. Wu involved a different time frame and required different proof than the theory of liability alleged in the first amended complaint. Indeed, the cause of action set forth in the first amended complaint pertaining to Dr. Pisano's treatment of Decedent's prostate following his elevated and abnormal PSA test levels in 2015, required medical records and testing from 2015 through 2017, and the expert reports and opinion testimony of a urologist. On the other hand, Dr. Wu's theory pertaining to Dr. Pisano's treatment of Decedent's liver required medical records and testing from 2010 through 2014 and the expert reports and opinion testimony of a hepatologist. Given these differences, we conclude that a material variance occurred because the proof presented at trial, consisting of Dr. Wu's reports and testimony, established a cause of action

regarding Dr. Pisano's treatment of Decedent's liver that was not alleged in the first amended complaint.[9]

Because this material variance occurred after the applicable statutes of limitation expired, the trial court erred as a matter of law by permitting Appellee to present the expert reports and testimony of Dr. Wu, which raised a new cause of action that was time-barred. We must therefore vacate the portion of the jury's verdict which finds in favor of Appellee on the liver cancer cause of action and awards compensatory damages on that cause of action.

Given our disposition of Appellants' first issue, we conclude that their second and third issues, regarding the trial court's failure to preclude the

_____

[9] We are mindful that "general allegations of a pleading, which are not objected to because of their generality, may have the effect of extending the available scope of a party's proof, such that the proof would not constitute a variance, beyond that which a party might have been permitted to give under a more specific statement." **Reynolds**, 676 A.2d at 1209-10 (citing Standard Pennsylvania Practice 2d, §§ 33:1, 33:6, 33:8 (1994)); **see also Connor**, 461 A.2d at 602 (holding that a motion to amend the complaint should have been permitted where the original complaint included a general allegation that defendant hospital was negligent "[i]n otherwise failing to use due care and caution under the circumstances"). In the instant matter, unlike in **Connor**, Appellee never sought to file a second amended complaint to include a cause of action regarding Dr. Pisano's negligence in reference to Decedent's liver cancer. Moreover, in **Connor**, the plaintiff's proposed amendments were part of a causally related chain of events which occurred on the same day and at the same place. In the instant matter, any amendment that Appellee might have sought would pertain to not only different days, but different years. Thus, **Connor** is wholly inapposite.

- 23 -

admission of Dr. Wu's expert reports as untimely,[10] and the trial court's failure to preclude Dr. Wu's expert testimony as unqualified, are moot.

In their fourth issue, Appellants contend that the trial court erred in permitting the trial testimony of Dr. DeCastro regarding Dr. Pisano's deviations from the standard of care applicable to primary care physicians. When we review a ruling on the admission or exclusion of evidence, including the testimony of an expert witness, our standard is well-established and very narrow. *See Freed v. Geisinger Med. Ctr.*, 910 A.2d 68, 72 (Pa. Super. 2006). The admission or exclusion of expert testimony is a matter falling within the sound discretion of the trial court, and we may reverse only upon a showing of abuse of discretion or error of law. *Id*. An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous. *Id*. In addition, to constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party. *Id*.

---

[10] We are mindful that the expert reports of Drs. DeCastro, Fried, and Wu were all produced by Appellee after the court-imposed and stipulated expert report deadlines had passed and the statutes of limitation had expired. Yet, Appellants lodged no objection to the tardiness of the expert reports of Drs. DeCastro and Fried. Nevertheless, unlike Dr. Wu's expert reports, the expert reports of Drs. DeCastro and Fried did not purport to raise a new cause of action that was not set forth in the first amended complaint.

Pursuant to P.R.E. 702:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge is beyond that possessed by the average layperson;

(b) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; and

(c) the expert's methodology is generally accepted in the relevant field.

Pa.R.E. 702.

The Medical Care Availability and Reduction of Error Act, 40 P.S. § 1303.101 *et seq*. ("MCARE"), sets forth additional requirements for expert testimony in medical professional liability actions. Specifically, MCARE provides:

No person shall be competent to offer an expert medical opinion in a medical professional liability action against a physician unless that person possesses sufficient education, training, knowledge and experience to provide credible, competent testimony and fulfills the additional qualifications set forth in this section as applicable.

40 P.S. § 1303.512(a). Additionally, MCARE requires that, an expert testifying on the standard of care in a medical matter must either: (1) possess an unrestricted physician's license to practice medicine in any state or the District of Columbia; or (2) be engaged in or retired within the previous five years from active clinical practice or teaching. *Id*. § 1303.512(b).

MCARE further provides:

- 25 -

**(c) STANDARD OF CARE.—** In addition to the requirements set forth in subsections (a) and (b), an expert testifying as to a physician's standard of care also must meet the following qualifications:

> **(1)** Be substantially familiar with the applicable standard of care for the specific care at issue as of the time of the alleged breach of the standard of care.
>
> **(2)** Practice in the same subspecialty as the defendant physician or in a subspecialty which has a substantially similar standard of care for the specific care at issue, except as provided in subsection (d) or (e).
>
> **(3)** In the event the defendant physician is certified by an approved board, be board certified by the same or a similar approved board, except as provided in subsection (e).

**(d) CARE OUTSIDE SPECIALTY.—** A court may waive the same subspecialty requirement for an expert testifying on the standard of care for the diagnosis or treatment of a condition if the court determines that:

> **(1)** the expert is trained in the diagnosis or treatment of the condition, as applicable; and
>
> **(2)** the defendant physician provided care for that condition and such care was not within the physician's specialty or competence.

**(e) OTHERWISE ADEQUATE TRAINING, EXPERIENCE AND KNOWLEDGE.—** A court may waive the same specialty and board certification requirements for an expert testifying as to a standard of care if the court determines that the expert possesses sufficient training, experience and knowledge to provide the testimony as a result of active involvement in or full-time teaching of medicine in the applicable subspecialty or a related field of medicine within the previous five-year time period.

*Id*. at § 1303.512(c)-(e). Because an issue regarding an expert's qualifications under MCARE involves statutory interpretation, our review is plenary. *See Jacobs v. Chatwani*, 922 A.2d 950, 956 (Pa. Super. 2007).

Although it is preferable that the medical expert be in the same specialty as the defendant physician, that is not what the law requires in every case. *See Vicari v. Spiegel*, 936 A.2d 503, 514 (Pa. Super. 2007) (concluding that a board-certified oncologist was qualified under MCARE to offer testimony regarding when a patient should be referred to him even though he did not treat patients until after their cancer diagnosis). Rather, the "same subspecialty" ideal contained in section 1303.512(c)(2) "includes an express caveat, reflecting the Legislature's decision to afford the trial court discretion to admit testimony from a doctor with expertise in another specialty that 'has a similar standard of care *for the specific care at issue*.'" *Smith v. Paoli Mem'l Hosp.*, 885 A.2d 1012, 1020 (Pa. Super. 2005) (quoting *Herbert v. Parkview Hosp.*, 854 A.2d 1285, 1294 (Pa. Super. 2004) (emphasis in original)).

Appellants claim that the trial court abused its discretion in permitting Dr. DeCastro, a urologist, to provide expert testimony regarding the standard of care applicable to Dr. Pisano, a board-certified internist practicing as a primary care physician. Appellants point out that Dr. DeCastro is not board certified in internal medicine and has no training in any other specialty relevant to the practice of primary care. Appellants maintain that screening

and referrals to specialists are the specific role of a primary care physician, not a urologist. Appellants contend that Dr. DeCastro was not competent to provide any testimony regarding the pertinent issue of screening for prostate cancer. Appellants claim that the admission of Dr. DeCastro's standard of care testimony was prejudicial because it was determinative of the jury's verdict on the prostate cause of action.

The trial court considered Appellants' challenge to the admission of Dr. DeCastro's testimony on the standard of care for screening and referrals and concluded that it lacked merit. The court stated: "the experts offered were trained in the use of medical screening tools to diagnose and treat patients based on medical history, examination, and symptoms presented." Trial Court Opinion, 6/13/22, at 8.

We discern no abuse of discretion by the trial court in permitting Dr. DeCastro to testify regarding the standard of care applicable to internists and primary care physicians when screening for prostate cancer and interpreting PSA test results. At trial, Dr. DeCastro was examined and cross-examined regarding his qualifications as an expert witness. Dr. DeCastro testified that he is a board-certified urologist and a urologic oncologist. *See* N.T., 10/19/21, at 78, 82. He explained that he graduated from Columbia University Medical School in 2004, and thereafter completed a five-year residency in urology at Columbia University. *Id*. Dr. DeCastro then completed a two-year fellowship in urologic oncology at the University of Chicago. *Id*. Since 2011, Dr.

DeCastro has been an attending physician at Columbia University Medical Center, Presbyterian Hospital, in New York. *Id*. at 79. Dr. DeCastro explained that, although he spends most of his time treating patients, he holds an academic position for which he teaches medical students and residents about urology and performs research. *Id*. at 79, 82. Dr. DeCastro stated that he spends three days per week seeing patients in clinic, and two days per week performing surgeries. *Id*. at 84-85. Dr. DeCastro testified that approximately forty percent of his clinical practice involves treating patients with prostate issues similar to those experienced by Decedent including *inter alia*, PSA issues, benign prostate hyperplasia (enlarged prostate), and prostate cancer. *See* 78-79, 82, 86. Dr. DeCastro testified that he is familiar with the standard of care applicable to evaluating adult patients with a history of benign prostate hyperplasia, following-up on lab work for patients, recognizing signs and symptoms of prostate cancer, and facilitating referrals to specialists such as himself. *Id*. at 87-88. Dr. DeCastro testified that the standard of care is "universal" for any physician who orders a lab, and that regardless of your specialty, "you are taking responsibility for that lab value and that you know its significance and the nuances of any value." *Id*. at 97. Dr. DeCastro explained, "if you take that lab, you have to interpret it and communicate with the patient and document such communication." *Id*.

Based on Dr. DeCastro's qualifications, we discern no abuse of discretion by the trial court in determining that he was competent to provide expert

testimony on the standard of care at issue – the interpretation and response to an abnormal PSA test ordered by a physician for his or her patient. The record reflects that a significant portion of Dr. DeCastro's practice was devoted to such care. Accordingly, we decline to disturb the trial court's determination. *See*, *e.g.*, *Hyrcza v. W. Penn Allegheny Health Sys.*, 978 A.2d 961, 973-74 (Pa. Super. 2009) (holding that an expert witness who was board certified as a psychiatrist and neurologist was competent to provide testimony as to the standard of care in relation to the defendant psychiatrist's treatment of a multiple sclerosis patient undergoing rehabilitation because a significant portion of the expert's practice was devoted to the specific care at issue); *see also Smith*, 885 A.2d 1012, 1016 (holding that a general surgeon, an oncologist, and an internist were permitted to testify against gastroenterologists as to failure to order a CT scan for patient with obscure gastrointestinal bleeding where each testified that they were actively involved with treating patients suffering from gastrointestinal bleeding and cancers); *Campbell v. Attanasio*, 862 A.2d 1282 (Pa. Super. 2004) (holding that a psychiatrist was permitted to testify as to the negligent use of an oral sedative by a third-year resident in internal medicine upon a patient with severe anxiety where the witness had prescribed the particular sedative on multiple occasions to individuals who suffered from anxiety); *Gartland v. Rosenthal*, 850 A.2d 671 (Pa. Super. 2004) (holding that a neurologist was qualified to testify as to the standard of care for a radiologist reading a CT scan of the

brain where the specific treatment at issue was the failure to report on the possibility of a tumor and recommend an MRI).[11]

In their final issue, Appellants contend that the trial court abused its discretion by granting Appellee's motion *in limine* to preclude, *inter alia*, the admission of evidence that in 2008, Decedent had been referred to a urologist on two occasions for his benign prostate hyperplasia (enlarged prostate) and refused to see a urologist. Our standard of review of a ruling on a motion *in limine* is well-settled:

> A motion *in limine* is used before trial to obtain a ruling on the admissibility of evidence. It gives the trial judge the opportunity to weigh potentially prejudicial and harmful evidence before the trial occurs, thus preventing the evidence from ever reaching the jury. A trial court's decision to grant or deny a motion *in limine* is subject to an evidentiary abuse of discretion standard of review.
>
> Questions concerning the admissibility of evidence lie within the sound discretion of the trial court, and we will not reverse the court's decision absent a clear abuse of discretion. An abuse of

_____

[11] Even if the admission of Dr. DeCastro's testimony regarding the applicable standard of care was error, such error was harmless, as the same standard of care testimony was provided by Dr. Fried, a board-certified specialist in internal medicine and adult primary care, whose expert testimony is not challenged on appeal. *See* N.T., 10/20/21, at 25-26, 34-35 (wherein Dr. Fried testified that Dr. Pisano deviated from the standard of care for primary care physicians by failing to recognize that Decedent's September 2015 PSA test result was "very abnormal," failing to have a discussion with him regarding his abnormal test result, and failing to refer him to a urologist for diagnostic testing and treatment). Thus, Dr. DeCastro's standard of care testimony was merely cumulative of other properly admitted evidence. *See **Blumer v. Ford Motor Co.**, 20 A.3d 1222, 1232 (Pa. Super. 2011) (holding that, even though the trial court erred in admitting certain reports, the content of the inadmissible reports was cumulative in nature to the admissible reports and, consequently, the evidentiary error was harmless).

discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous.

In addition, to constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party.

*Parr v. Ford Motor Co.*, 109 A.3d 682, 690-91 (Pa. Super. 2014) (citations omitted).

Evidence is relevant if "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Pa.R.E. 401. "All relevant evidence is admissible, except as otherwise provided by law. Evidence that is not relevant is not admissible." Pa.R.E. 402. Relevant evidence may be excluded "if its probative value is outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Pa.R.E. 403. "'Unfair prejudice' means a tendency to suggest decision on an improper basis or to divert the jury's attention away from its duty of weighing the evidence impartially." *Id.* Cmt.

The function of the trial court is to balance the alleged prejudicial effect of the evidence against its probative value, and it is not for an appellate court to usurp that function. *See Parr*, 109 A.3d at 696. Pennsylvania trial judges enjoy broad discretion regarding the admissibility of potentially misleading and confusing evidence. *See Daset Mining Corp. v. Industrial Fuels*

*Corp.*, 473 A.2d 584, 588 (1984). Evidence is prejudicial not where it merely hurts a party's case, but where it tends to fix a decision which has an improper basis in the minds of the jury. *Id.*

Appellants claim that the primary argument advanced by Appellee to preclude the admission of Decedent's non-compliance with the 2008 urology referrals was the prejudicial effect of such evidence in light of certain comments made by Dr. Pisano's during his deposition. In those comments, Dr. Pisano posited that, because of Decedent's non-compliance in 2008 with referrals to a urologist, Dr. Pisano would not have expected Decedent to comply with such referrals at later dates. Appellants contend that, at oral argument on Appellee's motion *in limine*, Appellants agreed not to present that particular testimony of Dr. Pisano at trial. Appellants therefore maintain that there was no longer any basis to preclude the undisputed evidence of Decedent's non-compliance with urology referrals in 2008.

Appellants acknowledge that Appellee additionally claimed at oral argument that the evidence of Decedent's non-compliance with referrals in 2008 should be precluded because it was too remote in time. Appellants assert that remoteness in time is not a ground for preclusion of evidence. Appellants further argue that, because Appellee's expert witnesses testified that Decedent should have been under the care of a urologist and that such care would have cured his prostate cancer, they essentially testified that

Decedent's compliance with his referrals to a urologist would have averted his death.

The trial court considered Appellants' final issue and concluded that it lacked merit. The court reasoned:

> [Appellants] sought to introduce evidence of the Decedent's . . . refusal to see a urologist in 2008 as evidence to support speculation that Decedent would have refused treatment of a urologist or hepatologist upon learning of abnormal test results. The facts and circumstances surrounding those events are unrelated to the matter before the court. The court determined that the allowance of such evidence would result in unfair prejudice, confuse the issues, and mislead the jury.

Trial Court Opinion, 6/13/22, at 9.

We discern no abuse of discretion by the trial court in precluding the introduction of evidence regarding Decedent's non-compliance with referrals to a urologist in 2008. There is no indication in the record that, had Decedent seen a urologist in 2008, the outcome of the case would have been any different. Even as late as 2012, Decedent's PSA level was in the normal range. Thus, whether Decedent did or did not see a urologist in 2008 was simply not relevant to the issue of whether Dr. Pisano failed to appreciate the clinical significance of Decedent's abnormal PSA test in September 2015 and refer him to a urologist at that time. Moreover, even if the evidence had some limited probative value, we discern no abuse of discretion by the trial court in determining that any such value was substantially outweighed by the danger of unfair prejudice, confusion of issues, or misleading the jury. ***See Daset***

***Mining Corp.***, 473 A.2d at 588. Accordingly, Appellants' final issue merits no relief.

Finally, we address Appellants' request for a new trial limited solely to the prostate cancer cause of action as a remedy for the improper introduction of Dr. Wu's testimony and the submission to the jury of the time-barred liver cancer cause of action. In considering Appellants' request, we are mindful of the general verdict rule which provides that "when the jury returns a general verdict involving two or more issues and its verdict is supported at least as to one issue, the verdict will not be reversed on appeal." ***Cowher v. Kodali***, 283 A.3d 794, 804 (Pa. 2022) (quoting ***Shiflett v. Lehigh Valley Health Network, Inc.***, 217 A.3d 225, 234 (Pa. 2019) (citation omitted)). Elaborating on the rule, our Supreme Court has stated: "'a defendant who fails to request a special verdict form in a civil case will be barred on appeal from complaining that the jury may have relied on a factual theory unsupported by the evidence when there was sufficient evidence to support another theory properly before the jury.'" ***Id***. (quoting ***Shiflett***, 217 A.3d at 234). Our Supreme Court went on to explain:

> Thus, under the rule, when a litigant fails to request a special verdict slip that would have clarified the basis for a general verdict, and the verdict rests upon valid grounds, the right to a new trial is waived. **The rule promotes judicial efficiency by preventing needless retrials** as well as fairness by keeping a litigant from benefiting from its own omission in failing to request a special verdict slip.

*Id*. (quoting *Shiflett*, 217 A.3d at 234) (citations, quotations and brackets omitted, emphasis added).

In *Shiflett*, as in the instant matter, the plaintiffs brought a medical negligence action against a hospital and were later permitted, over objection, to amend the complaint to add a new cause of action which was barred by the statute of limitations. Following trial, a jury returned a general damage award for the plaintiffs. On appeal, this Court determined that the trial court erred by permitting the plaintiffs to amend the complaint to add the time-barred cause of action and remanded for a new trial limited to damages. However, our Supreme Court reversed, explaining that where a time-barred theory of liability is improperly submitted to the jury, and the defendant fails to request a clarifying special verdict interrogatory that would have obviated the need for a new trial, the verdict will stand. *See Shiflett*, 217 A.3d 236; *see also Cowher*, 283 A.3d at 806 (explaining that "[a] special verdict slip . . . asking the jury to itemize the pain and suffering damages and other component parts of the survival award would have clarified the specific amount of damages attributable to Dr. Hayek's testimony, obviating the need for the new trial on the totality of damages under the Survival Act").

In this case, unlike *Cowher* and *Shiflett*, Appellants requested a detailed special verdict form which was submitted to, and completed by, the jury. Accordingly, the jury in this matter specified its separate findings of liability, causation, and damages attributable to both Appellee's negligence

claim against Appellants for Decedent's prostate cancer and Appellee's negligence claim against Appellants for Decedent's liver cancer. **See** Verdict Sheet, 10/22/21, at unnumbered 1-5. In so doing, the jury clarified its award of damages attributable to Dr. Wu's testimony and the time-barred liver cancer cause of action, thereby obviating the need for a new trial on the prostate cancer cause of action. Therefore, as the intent of the jury is clear, we vacate the order entering judgment, vacate and the portion of the jury's verdict as it relates to liability and damages against Appellants on the liver cancer cause of action, affirm the portion of the jury's verdict as it relates to liability and damages against Appellants on the prostate cancer cause of action, and remand for the trial court to enter judgment in favor of Appellees on the prostate cancer cause of action for compensatory damages in the amount of $1,500,000 plus delay damages.

Judgment vacated. Verdict affirmed in part and vacated in part. Case remanded for further proceedings consistent with this memorandum. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/7/2023